## STATE v. STANLEY DAVID PETERS.

143 N. W. (2d) 832.

June 24, 1966—No. 39,810.

*Daniel F. Foley,* for appellant.

*Robert W. Mattson,* Attorney General, *Gerard W. Snell,* Solicitor General, and *John A. McHardy,* County Attorney, for respondent.

NELSON, JUSTICE.

Defendant appeals from a judgment of conviction of aggravated assault entered by the district court on a plea of guilty.

It appears that on June 27, 1964, the defendant was confronted by a local police officer, Howard Gludt, in Lake City, Minnesota, during the early hours of the morning. The police officer was at the time acting on information that he had received which led to the suspicion that defendant had stolen an outboard motor and had it in the trunk of his car. After receiving this information the officer located the defendant and informed him that he would like to take a look into the trunk of his car, which was parked on a side street in the rear of the hotel at which defendant was staying. The officer and the defendant thereupon walked to the car. When they reached it, defendant drew a .22 caliber revolver on the officer and told him to drop his gun which the officer had in his holster. The officer failed to respond to the defendant's demand and started backing up toward an entrance to a storage room in the hotel in which the defendant was keeping fishing tackle and equipment. Defendant followed the officer, continuing to walk toward him, demanding that he drop his gun. The officer continued walking backward, facing the defendant. During this period the officer's weapon remained in his holster. When they reached the hotel, the officer unwittingly backed into the open door to the storage room. When this occurred, the officer grabbed defendant and both fell to the street. A struggle followed. Defendant struck the officer around the head and shoulders with his revolver. Defendant also fired several shots in the direction of the officer, but it is not clear from the record whether he fired directly at him or whether some or all of the firing occurred during the struggle and while the defendant was beating the officer with the butt of his revolver. One of the shots fired pierced the fleshy part of the officer's left shoulder. The officer also received a head injury, but it is not clear from the record whether it was caused by the beating or by a bullet which might have grazed him. After the struggle and shooting, defendant fled. Some weeks later he was apprehended in the State of Iowa, where he waived extradition and was returned to Minnesota.

On July 28, 1964, the county attorney of Wabasha County certified to the district court that defendant had been charged by a complaint filed in the probate court of Wabasha County with having committed the crime of aggravated assault, a felony under the laws of this state; that

the defendant had requested the judge of the probate court to have counsel appointed to assist in his defense; and that the probate court had been satisfied by oath of the defendant that he was unable by reason of poverty to procure counsel. Thereupon one of the judges of the district court appointed Martin J. Healy, an attorney at law of Wabasha and former county attorney, to represent defendant during the proceedings brought against him.

The defendant waived a preliminary hearing and was arraigned before the district court on September 3, 1964, on an information charging him with aggravated assault in violation of Minn. St. 609.225, subd. 1, which provides:

"Whoever *intentionally* inflicts *great bodily harm* upon another may be sentenced to imprisonment for not more than ten years or to payment of a fine of not more than $10,000, or both." (Italics supplied.)

On this appeal defendant contends that he lacked the intent required by this statute and that he in fact did not inflict "great bodily harm" on the officer. He claims also that he denied the essential elements of the crime and that the court erred in accepting his plea of guilty. He contends that at most he was guilty of violating § 609.225, subd. 2, which provides:

"Whoever assaults another with a dangerous weapon but without intent to inflict great bodily harm may be sentenced to imprisonment for not more than five years or to payment of a fine of not more than $5,000, or both."

The record does not support defendant's contentions. It shows that defendant, from the time he waived extradition, until his arraignment had been held in the Wabasha County jail where his court-appointed attorney had ample opportunity to consult with him on the charge placed against him. At the arraignment the court ascertained by questioning defendant and Mr. Healy that defendant had received legal representation since Healy's appointment and was satisfied with it; that he had been advised of the purpose of a preliminary hearing and had knowingly and voluntarily waived such hearing; and that he had knowingly and voluntarily waived extradition. The court then asked the following questions:

312

"THE COURT: Now, Mr. Healy, since July 28, over a month has expired. Are you able to tell this court why there has been the delay of over a month in bringing the defendant before the Court?

"MR. HEALY: Yes, your honor. * * * [T]he defendant had some hesitancy or misunderstanding about the word 'intentionally' in the complaint. On two or three times, we went over that matter as to whether or not he was guilty of the second one—Section 1 or Section 2 of the assault statute. * * * I advised him that the word 'intentionally' didn't necessarily mean pre-meditation and planning; that a man who beats you over the head with a hammer was assumed to intend the natural results of the beating. It's my opinion that he now understands even though there was no intention to kill, that these are implied from the acts. Is that right?

"DEFENDANT: Yes.

"MR. HEALY: We went over this several times, your honor."

The court then inquired whether defendant and his counsel had had adequate time for consultation and research and was assured that they had. The information was then read, and the court asked the following questions:

"* * * The information was correctly presented, was it not, Mr. Peters?

"DEFENDANT: Yes.

"THE COURT: Mr. Healy?

"MR. HEALY: Yes, your honor.

"THE COURT: Mr. Healy, have you advised this defendant of the possible sentence that might be imposed if he would enter a plea of guilty to the information?

"MR. HEALY: Yes, your honor, I brought to his cell and left with him some weeks ago a typewritten copy of the entire section, both 1 and 2, which recite the 10-year punishment.

"THE COURT: Is that true, Mr. Peters?

"DEFENDANT: Yes.

"THE COURT: Now, have you advised him of his constitutional rights?

"MR. HEALY: Yes, your honor."

Further questioning developed that defendant was fully aware of his

right to legal representation; his right to jury trial; the degree of proof required for conviction; the need of a unanimous verdict for conviction; and his right against self-incrimination. The court then asked:

"* * * Has any person in authority of any kind, such as a sheriff, * * * or any police officer of any kind or any prosecuting attorney or assistant prosecuting attorney, or any judge of any kind * * * or any person in authority made any promises to you of leniency if you would enter a plea of guilty to this information?

"DEFENDANT: Not directly, no.

"THE COURT: Has any such person done that indirectly?

* * * * *

"DEFENDANT: Well, there was no direct promises, no.

"THE COURT: Well, before you enter a plea to this information, I want the record to show positively that you are not going to enter a plea of guilty because you think that because entering such a plea the court may be lenient with you, because I am telling you now that it won't make any difference to me whether you plead guilty or whether you are found guilty, if you ultimately are guilty, in sentencing you. That wouldn't make any difference whatsoever.

"DEFENDANT: I knew that at the time.

"THE COURT: You understand that?

"DEFENDANT: Yes.

* * * * *

"THE COURT: You understand precisely of what you are accused?

"DEFENDANT: Yes.

"THE COURT: You understand the possible sentence that may be imposed?

"DEFENDANT: Yes.

"THE COURT: Very well, then, to this information, what is your plea? Guilty or not guilty?

"DEFENDANT: I plead guilty, your honor."

At the request of the court the county attorney gave a résumé of the events leading to the charge. Defendant's attorney then made a statement on behalf of defendant covering his early life; employment; marriage

and divorce; and his addiction to gambling and drinking, which had resulted in his issuing worthless checks, an automobile theft, and imprisonment in Wisconsin. Defendant was then questioned by the court. With respect to the assault defendant indicated that the county attorney's statement of the occurrence wasn't entirely accurate. The court then asked:

"Q. Just tell us how you want to correct this statement?

"A. Well, the fact is that when we left the car after—

"Q. You mean you and Mr. Gludt?

"A. Yes, I pulled the gun out and pointed it at him and asked him to drop his weapon.

"Q. Drop his weapon? Did he have it in his hand?

"A. No. It was in his holster but he didn't and he started walking backwards and I didn't touch him at all anytime until we walked a half a block.

"Q. He had walked backward a half a block?

"A. Yes, he was walking backwards and there was a door.

"Q. Was he saying anything when he was walking backwards?

"A. He just kept saying, 'No', that he wouldn't drop his weapon. And, I said, 'Well, drop it,' and so he walked almost half a block and finally there was a little door in the storage room where I had kept some fishing equipment at the side of the hotel. It was open a few inches and he was going and he bumped into the door and as he turned to miss the door, he grabbed me and we both fell into the street. I started hitting him—hitting him to get loose to get away, and that gun was firing. It fired two or three times.

"Q. Your gun?

"A. Yes.

"Q. While you were hitting him, the gun went off?

"A. Yes, but at no time I did not point it at him and pull the trigger and as soon as I got up from the street, I ran and he was sitting in the street holding his hand on his head.

"Q. But you were striking him with this gun?

"A. Yes, I did.

"Q. You say, in the process of striking him, that your finger was on the trigger and it went off?

"A. Yes.

"Q. That's the way—you say that these people who would testify that you stood back while he was on the ground and deliberately shot at him; that's completely false? You say that's not true?

"A. Yes, because as soon as I got up off the ground I was hitting him. I was on my knees part of the time and as soon as I got loose I got up and ran and he was sitting in the street holding his head. But statements that I read said that there had been some four shots—some said three—some said five.

"Q. Do you know how many shots there were fired?

"A. There were three shots fired.

"Q. Where did you get this gun that you had?

"A. In Lake City.

\* \* \* \* \*

"Q. Why did you pull out the gun and want to take his gun away from him?

"A. Because I thought that would be the only way I could get away from him at the time. I mean I wasn't thinking too clearly at the time but I knew—I realize now it was a real foolish thing to do. I thought he would drop his gun and then I would flee because I was thinking about turning to run but I was afraid if I ran he would possibly shoot at me."

At the end of the questioning, the court sentenced defendant to the commissioner of corrections for a period of not to exceed 10 years.

The questions before this court on appeal are whether defendant's conduct amounted to intentional aggravated assault within the meaning of Minn. St. 609.225, subd. 1, and whether the court erred in accepting the plea of guilty.

■ It would appear from a reading of the transcript of the proceedings that defendant's plea of guilty admitted all the essential elements of the crime charged. Defendant was represented by competent counsel, a former county attorney who was experienced in the criminal field, and it must be assumed that his counsel had advised defendant of all phases of the charge, the extent of the injuries committed, and all possibilities of proof. The defendant did not challenge the information—he only suggested to the court that certain statements by the county attorney as to

the circumstances of the encounter with the police officer were not accurate. He was given a full opportunity to explain, but that explanation does not indicate a denial of the essential elements of the crime. In State v. Alm, 261 Minn. 238, 111 N. W. (2d) 517, and State ex rel. Cobb v. Rigg, 251 Minn. 208, 87 N. W. (2d) 363, we held that where a defendant in a criminal case who is represented by competent counsel enters a plea of guilty to a charge contained in an information filed against him, the general rule is that he waives all defenses other than that the information charges no offense. In the instant case the information charged the defendant with intentionally inflicting great bodily harm upon the police officer by assaulting him with a revolver, shooting him, and striking him about the head, face, and body with the revolver. The information clearly charged the essential elements of the crime. An indictment for an assault with a dangerous weapon with intent to do great bodily harm, which charges a beating and wounding with the weapon, does not charge two offenses. State v. Dineen, 10 Minn. 325 (407).

While defendant contends he did not intend to harm the officer, obviously a man's intentions are determined by his outward manifestations of them. If a man bludgeons another with the butt of a loaded revolver and the revolver discharges causing great bodily harm, he is presumed to have intended the natural and probable consequences of his act. State v. Crandall, 227 Iowa 311, 288 N. W. 85. Defendant stated that he was motivated only by a desire to escape being arrested. No matter what the motive of his attack on the officer may have been, he used a loaded revolver and if it discharged, causing great bodily harm to the officer, defendant must be presumed to have intended the consequences of his act.

■ Defendant contends also that he did not inflict "great bodily harm" on the officer.

Minn. St. 609.02, subd. 8, contains the following definition of great bodily harm:

" 'Great bodily harm' means bodily injury which creates a high probability of death, or which causes serious permanent disfigurement, or which causes a permanent or protracted loss or impairment of the function of any bodily member or organ or other serious bodily harm."

We find the words "great bodily harm" defined in a number of cases in 18A Wd. & Phr. (Perm. ed.) p. 450:

" 'Great bodily harm' means 'great bodily injury.' [Citation omitted.]

"The words 'great bodily harm' usually imply an injury of a greater and more serious character than battery. [Citation omitted.]

\* \* \* \* \*

"\* \* \* *By 'great bodily harm' is meant more than mere injury by fist, such as is likely to occur in ordinary assault and battery.*" (Italics supplied.)

It is clear that the injuries defendant inflicted on the officer constituted "great bodily harm" both as that term is defined in § 609.02, subd. 8, and as it has been defined elsewhere.

Essentially, defendant's claim appears to be that he should have been charged with violation of § 609.225, subd. 2, which applies to assaults with a dangerous weapon but without *intent* to inflict great bodily harm. No doubt the court, having been advised of defendant's previous criminal experience, didn't take seriously his statements that he had no ill will against the police officer and had no intention to injure him. The facts are that what he did he did purposely in order that he might escape arrest. Under the circumstances the contention that he did not intentionally commit aggravated assault and as a result inflict great bodily harm upon the officer is not persuasive.

■ The record clearly shows that defendant was fully informed of the charge against him; that he had competent counsel at the critical stages of the proceedings; and that no evidence obtained in violation of defendant's constitutional rights was used to induce him to plead guilty. The court exercised great caution in interrogating the defendant as to whether any promises had been made to induce the plea and told him plainly that it would make no difference in sentencing whether he were to plead guilty or stand trial and be found guilty. Defendant knew precisely of what he was accused and the possible sentence that might be imposed and under those circumstances openly and on his own entered the plea of guilty to the charge. The attack now being made on the judgment of conviction illustrates the reason why such pleas should be ac-

cepted by the trial court only with great caution to insure that a defendant may be fully advised of all of his rights. In this case, however, what we said in the recent case of State v. Roggenbuck, 271 Minn. 557, 561, 136 N. W. (2d) 857, 860, is applicable:

"It is our opinion that on the record no reversible error exists in terms of any failure of duty on the part of the trial court to the defendant. Rather, it appears that under the facts and circumstances the trial court extended him every reasonable latitude and consideration in permitting him to present his side of the case, both through his attorney and by himself."

The defendant's own admissions and statements appear conclusive as to his guilt of the crime with which he was charged, and there was no abuse of discretion on the part of the trial court in accepting the plea of guilty.

Affirmed.