**Eddie Lee LENZY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 07–84–0103–CR.**

Court of Appeals of Texas, Amarillo.

April 19, 1985.

Law Firm of Floyd Holder, Sam Ogan, Lubbock, for appellant.

Jim Bob Darnell, Dist. Atty., Ruth Cantrell, Asst. Dist. Atty., Lubbock, for appellee.

Before REYNOLDS, C.J., and COUNTISS and BOYD, JJ.

BOYD, Justice.

Appellant Eddie Lee Lenzy brings this appeal from his conviction of aggravated sexual assault and the consequent jury-assessed punishment of life imprisonment. In two grounds, he asserts that the evidence is insufficient to prove: (1) penetration of the vagina of the victim by the sexual organ of appellant and (2) serious bodily injury suffered by the victim, as defined in Tex.Penal Code Ann. § 1.07(a)(34) (Vernon 1974). We disagree with appellant's contentions and affirm his conviction.

On September 22, 1983, at approximately 3:30 p.m., the victim, who was a secretary for the Veterans Administration, entered a women's restroom located on the second floor of the Federal Building in Lubbock. As she entered that restroom she noticed a black man using a pay telephone located in an adjacent hallway. Once in the restroom, she entered the first stall and pulled down some of her clothing. Within seconds the restroom went completely dark. She became "terribly afraid" and pulled up her clothes. The lights went on again and she heard "soft footsteps walking, walking." She looked out the crack in the door but saw nothing. She "wanted out real quickly" and opened the stall door. As she did so, the "black man stepped up, had his hand on the outside" and took hold of her wrist. She told the man, whom she said was the same person she had seen using the telephone, "You are not supposed to be in here, this is the ladies' restroom." The man grinned, said "Come on," and asked her name. When she entreated him to let her go he responded, "No, and it will do you no good to ask me again." She pulled away from him, trying to reach the outside door, and had no further recollection of what happened until she regained consciousness on the restroom floor.

When asked about her condition upon regaining consciousness, she responded:

When I came to, when I came to, I was lying on my back, on the floor, staring at an overhead light. For a moment, I just looked at the light. I didn't know what had happened. After a moment, I turned my head and saw part of my clothes.

The victim's panty hose and panty girdle were lying about a foot above her head, her skirt was pulled up "[t]high length" and she did not have on any undergarments. There was blood on the floor close to where her clothes were and "approximately where [her] head was." She was able to pick up her clothes and leave the restroom but then passed out again. Her next recollection was hearing a doctor, a co-worker, question her about her condition. At that time she said, "[T]he left side of my chest hurt. I was real nauseated. Very nauseated. My stomach hurt. My face hurt."

Subsequent examination revealed that the victim was beaten about the face and head and she had to have three teeth crowned and two root canals. Her lower abdomen and back also hurt. She was kept in the hospital for two days for treatment of those injuries and to check for suspected cranial damage. She returned to work on November 8, 1983 but "couldn't work a full week. I took a lot of sick leave" because "I just couldn't handle the whole week" and, at the time of the trial, had again been off work for three weeks. Since the date of the incident she had been under the continuous care of a psychiatrist. Approximately one month before the trial she had reached the point where her alternatives "were to go stay with my brother and his wife, have family support and get psychiatric care there, or be hospitalized psychiatrically here." She chose to stay with her brother. All of this, she testified, was a result of the occurrence here in question. As a result of her beating, the victim's facial appearance was sufficiently altered that when she saw herself for the first

time, four days after the accident, her thought was, "I guess this is me but it doesn't look much like me."

Janelle Carr, an employee of the United States Department of Agriculture, was one of the first to see the victim as she lay on the hall floor outside the restroom. She said the victim "was extremely swollen in the face and so badly swollen, she—I wasn't able to tell that I even knew her. Blood was running out of her mouth on both sides. Down to the floor. Her eyes were open but she didn't seem to be really seeing us." She went on to say that the victim "was beaten so badly, her face was so swollen, that she was unrecognizable. And I thought it was just a woman that I didn't even know."

Rebecca Gregory, an Assistant U.S. Attorney whose office was in the Federal Building, was also one of the first to see the victim. She characterized the appearance of the victim's face as "exceedingly swollen" and it "looked like it had exploded from within." Later she said her face looked "like a volcano had exploded. She was very badly beaten around her jaw and cheek area."

Dr. James Terry Gage was the physician who examined the victim in the emergency room at Methodist Hospital in Lubbock. Dr. Gage said that at the time of her arrival at the emergency room, she was suffering from "severe swelling from beating around her head and face," had some tenderness over her back and abdomen and was very emotionally distressed. Because of what he characterized as the "severity" of her injuries, he was concerned that she might develop a neurological problem requiring surgical intervention. However, the specialist who checked her, Dr. Denton DeWitt, determined that no surgical procedures were required. Dr. Gage also said that the usual specimens taken from rape victims such as fingernail scrapings, pubic combings and washings from the vagina and the perineal area were taken in the presence of a Rape Crisis volunteer. In his examination, he found no evidence of vaginal tearing on the victim.

Lab tests of the results of the washings were made to detect any evidence of intercourse that might have culminated in ejaculation. The washings were checked for sperm and acid phosphatase, a chemical present in the male prostate gland. In the tests made at the hospital, no sperm was found, but a low concentration of acid phosphatase was found.

Dr. Gage said this type of low-level acid phosphatase is present in male secretions in the urethra and "may be present as a lubricant in the urethra" and left by the male in the vagina even though ejaculation may not have occurred. He also testified that the absence of trauma to the vaginal area did not mean that no penetration occurred, since such trauma did not always occur. Further, he stated that the victim's lower back pain and later vaginal discomfort were consistent with a female having sexual intercourse while lying on a tile floor. It was his expert opinion that the victim had had sexual penetration by a male. When asked on cross-examination whether there were low levels of acid phosphatase activity commonly present in female vaginal fluids, he replied that he was not aware that such a condition could exist. When Dr. Gage was given the legal definition of "serious bodily injury" he testified that in his opinion the injuries fit within that statutory definition.

█ Joanie Bumpass, the Lubbock Rape Crisis Center volunteer who was present at the emergency room, in her report identified the incident as an "aggravated assault with intent to kill." Appellant points to this as an indication that Ms. Bumpass believed the occurrence was not a rape. However, upon redirect examination, she testified that her act was strictly "a personal opinion at that time" and she "left it to the center" to determine the offense. In any event, her report was merely one of the circumstances to be considered by the jury in their determination of the question as to whether penetration occurred. Parenthetically, we note that Bumpass' characterization might also be legitimately considered as an indication of her opinion as to

the severity of the assault and the extent of the injuries suffered by the victim.

David Legg was the Department of Public Safety chemist who analyzed the specimens submitted by the Lubbock Rape Crisis Center. He testified that his test did not reveal the presence of any sperm or acid phosphatase in the vaginal and perineal washings taken from the victim and submitted to them. He acknowledged that a finding by another laboratory of the presence of acid phosphatase in similar washings might indicate the use of a more sensitive test by that laboratory. He explained that the type of test conducted by him was to determine qualitative as opposed to quantitative results and he did not conduct tests to determine the level of any acid phosphatase. He did say that there were instances where low levels of acid phosphatase occurred in the female body and that such a presence would not be an "ironclad" indication of sexual activity.

Officer James Childers, a Lubbock policeman, was qualified as a fingerprint expert. He testified that he was able to retrieve a latent partial palm print from the pull plate on the interior door in the restroom. He further opined that, as with fingerprints, no two persons have the same palm prints. He identified the palm print found by him as that of appellant.

Appellant testified and denied he had been in that building since 1982. He said the identification of the palm print as his was a "mistake."

 In an offense of this nature, the State must establish penetration of the female sex organ. Tex.Penal Code Ann. § 22.011(a)(1)(A) (Vernon Supp. 985). In the instant indictment, it was alleged that the penetration was by appellant's sex organ. While proof of the slightest penetration is sufficient, that element of the offense must be proved beyond a reasonable doubt. *Sherbert v. State,* 531 S.W.2d 636, 637 (Tex.Crim.App.1976). However, that penetration may be proved by circumstantial evidence and there is no requirement that the victim be able to testify as to penetration. *Nilsson v. State,* 477 S.W.2d 592, 595–96 (Tex.Crim.App.1972).

 In reviewing a factual insufficiency claim, this Court must inquire "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Wilhoit v. State,* 638 S.W.2d 489, 494 (Tex.Crim. App.1982). Circumstantial evidence is sufficient to support a conviction if the facts proved support a reasonable inference that the accused committed the crime and they exclude every other reasonable hypothesis except that of the guilt of the accused. *Wilson v. State,* 654 S.W.2d 465, 467 (Tex. Crim.App.1983); *Phelps v. State,* 594 S.W.2d 434, 436 (Tex.Crim.App.1980). It is not necessary, however, that every fact directly and independently point to the accused's guilt. It is enough if the conclusion is warranted by the combined and cumulative force of all of the incriminating circumstances. *Flores v. State,* 551 S.W.2d 364, 367 (Tex.Crim.App.1977). While presence at the scene of an offense, without more, is insufficient to support a conviction, it is a circumstance which, combined with other facts, may be sufficient to show that the accused is guilty. *Thompson v. State,* 563 S.W.2d 247, 250 (Tex.Crim.App. 1978).

 The testimony by the victim that she was fully clothed prior to the encounter with appellant inside the restroom, but upon regaining consciousness her underclothing was removed and her dress "hiked up," coupled with the testimony of Dr. Gage and joined with the other surrounding circumstances, is sufficient to justify the evident conclusion of the jury that the rape had occurred. The record does not support any other reasonable hypothesis for the peculiar circumstances of the removal of the victim's clothing, the onset of the low back and abdominal pain, etc. While appellant advances the proposition that the abdominal pain might have oc-

curred as a result of the victim's fall on the floor, that proposition falls far short of a reasonable explanation of the other circumstances.

■ Appellant also advances the theory that the jury might have been incensed by what they saw as appellant's perjury in denying his presence in the women's restroom when the evidence overwhelmingly indicates otherwise, and was thereby influenced in making their decision as to penetration. There is nothing in this record to justify that conclusion. In summary, the combined and cumulative force of all the incriminating circumstances is sufficient to justify the jury's conclusion that penetration did occur. Appellant's first ground of error is overruled.

In his second ground of error, appellant questions the sufficiency of the evidence to prove the existence of serious bodily injury as defined in Tex.Penal Code Ann. § 1.07(a)(34) (Vernon 1974). Again, we disagree.

■ In section 1.07(a)(34), serious bodily injury is defined as "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." The victim was also treated by Dr. James Carpenter, a dentist. In describing the victim's condition on September 26, 1983, the date when he first saw her, Dr. Carpenter said:

> [S]he was one massive hematoma. Her face was swollen, at least a third, maybe a half larger than it was the last time I had seen her. It was black and—just almost solid black. She had some laceration around the mouth. It was difficult to get into her mouth to examine her. But upon examination, we found that the maxillary or upper right, first lower, the second premilar [sic] and first premolar, were all fractured. The first premolar had the lingual or inside cusp completely fractured off. The second premolar had the buckle or the outside cusp fractured off.

It was necessary for him to perform two root canals and install three porcelain crowns to restore the utility of those teeth. His testimony is sufficient to establish that, without his remedial work and treatment, the teeth in question would have been lost or their use substantially impaired. Dr. Carpenter concluded that the injuries to the victim's teeth would have resulted in their protracted loss or impairment. The Penal Code does not specifically define the term "bodily member or organ," and we have neither been cited nor found a court definition of that term. Therefore, we are directed that that term be "taken and understood in [its] usual acceptation in common language." Tex.Code Crim.Proc. Ann. art. 3.01 (Vernon 1977). A law dictionary has defined bodily member as, "A part or organ of the body; especially a limb or other separate part." Black's Law Dictionary 887 (5th Ed.1979). Common usuage as well as the legal definition suggested above leads us to hold that teeth are separate, definable parts of the body sufficient to bring them with the statutory term "bodily member or organ."

Moreover, Dr. Gage testified that the severity of the head injuries suffered by the victim did create a risk of intracranial or brain swelling that could cause death or serious permanent injury. The severity and concomitant risk of such injuries is emphasized by the testimony of the other witnesses as to the victim's condition after the incident. We are cautioned by the Court of Criminal Appeals that the relevant issue is the "disfiguring and impairing quality of the bodily injury as it was inflicted, not after the effects had been ameliorated or exacerbated by other actions such as medical treatment." *Brown v. State*, 605 S.W.2d 572, 575 (Tex.Crim.App.1980). We also think that, in its decision as to the severity of the injuries and their duration and effect, the jury was entitled to consider the victim's testimony that since the event and even up to the time of the trial, she continued to have difficulty in working which she attributed to the injuries she received. The evidence is sufficient to sup-

port the jury's verdict. Appellant's ground of error two is overruled.

There being no reversible error, the judgment of conviction is affirmed.