STATE of South Dakota, Plaintiff
and Appellee,

v.

Lance BOGENREIF, Defendant
and Appellant.

No. 17011.

Supreme Court of South Dakota.

Considered on Briefs Nov. 26, 1990.

Decided Jan. 30, 1991.

Gary R. Campbell, Asst. Atty. Gen.,
Pierre, for plaintiff and appellee; Roger A.
Tellinghuisen, Atty. Gen., Pierre, on the
brief.

Jeff Larson, Minnehaha County Public
Defender, Sioux Falls, for defendant and
appellant.

MORGAN, Retired Justice.

Lance Bogenreif (Bogenreif) appeals a
judgment entered pursuant to a jury ver-
dict convicting him of aggravated assault.
Bogenreif argues that the victim's injuries

did not constitute serious bodily injury, that he was entitled to an instruction on self-defense, that he was denied an opportunity to cross-examine the complaining witness, and that the trial court should have granted a mistrial. We affirm.

This case stems from an altercation which took place at the South Dakota State Penitentiary on May 28, 1989, between inmates Bogenreif and James Allen (Allen). In February 1989, Allen entered the state penitentiary. A few weeks after his arrival, other prisoners on his floor accused Allen of being a "snitch" or informer, and told him that they wanted him off their floor. Allen then wrote a letter to Colonel Rist, an officer at the penitentiary, in which he related that he was being threatened and requested that he be moved. He went on to state that he wanted to avoid disciplinary problems, and that if a fight did break out, he wanted Colonel Rist to know that he had not provoked it. A few days later, after meeting with Colonel Rist, Allen was moved to a different cell in another wing of the prison.

About four hours after he moved into his new cell, Bogenreif, who was assigned to an adjacent cell, stopped by Allen's cell and accused him of being a "snitch." Allen denied the accusation and told Bogenreif that he had just moved from one area of the prison and could not do so again. Bogenreif then threatened Allen, stating "Well, you're either going to move to PC [protective custody], to the hospital or worse." According to Allen, the two men did not speak to one another again until May 13, 1989, when Bogenreif again accused Allen of being an informant, and renewed his earlier threat. Later that same day, Allen related the incident to his wife during their visit, and to Colonel Rist in a second letter. In his letter, Allen again stated that he wanted to avoid discipline problems, and added that if there was a fight between Bogenreif and himself, he would not be the one who started it. Allen also related this to his counselor on May 17, 1989.

It is undisputed that Bogenreif and Allen were involved in an altercation on May 28, 1989. On that morning, Allen returned to his cell after brunch, and went to sleep. Although his cell door was locked, all closed doors were later automatically opened for a short time after 1 p.m. to allow inmates an opportunity to leave their cells for recreation. Bogenreif used this opportunity to enter Allen's cell while he slept. According to Allen, he was awakened from what he thought was a nightmare, to find someone standing over him, striking him in the face repeatedly. Allen attempted to block the blows and grabbed the assailant's wrist. As the assailant left his cell, Allen identified him as Bogenreif. Allen then closed and locked the door of his cell and summoned assistance.

Bogenreif's version of the events is predictably different. He claims that Allen instigated the problems between the two men by calling him profane names. At trial, inmate Dirk Pace (Pace) testified that Allen came out of his cell to verbally taunt Bogenreif, Bogenreif told Allen to "keep his mouth shut," and then Allen pushed Bogenreif. Then, according to Pace, Bogenreif pursued Allen into Allen's cell, as Allen attempted to close his cell door.

After being transported to a hospital, Allen was examined and treated by Dr. Michael Olson. Dr. Olson testified at trial that Allen had loosened teeth, abrasions around his cheeks, and a very extensive laceration of his lip. The lip cut was jagged and irregular, and the muscles that permit smiling or frowning were severed. Nerve endings in the area of Allen's lip were disturbed, causing sensitivity to heat and cold. The lip damage, which extended completely through the lip, resulted in a permanent scar. Dr. Olson stated that Allen's injuries were not life-threatening, but he would be affected for the rest of his life:

In terms of life-threatening, no. It was not a life-threatening injury. In terms of more problems, disability, it certainly can and will have an effect. In the case of Mr. Allen, he will have a scar or a cosmetic defect on his lower lip that is going to be there forever. I suspect with time, hopefully, the hot, cold sensitivity will

improve. The biggest problem as you have already discussed have been [sic] the dental work.

Dr. Allen Bliss, the first dentist to examine Allen, testified that the alignment of Allen's teeth and his bite had been altered. X-rays revealed that some of his teeth had been moved in their sockets and Dr. Bliss determined that four would have to be removed and replaced with dentures. Dr. Bliss testified that Allen will have permanent difficulty eating.

Dr. Donald J. Fischer, another dentist who treated Allen, testified that three days after the incident Allen was in so much pain that he could not close his mouth. Allen's four upper front teeth were very mobile, and an infection had set in around those teeth. The infection resulted from cracks in the roots of Allen's teeth. Dr. Fischer testified that he extracted Allen's two upper front teeth which had been broken two-thirds of the way down the roots, and that he had to surgically remove fragments of the roots. He also testified that two additional teeth were to be removed shortly after trial. According to Dr. Fischer, the alignment of Allen's teeth will never be the same, he will need a partial denture, and the artificial teeth will never function as well as real teeth.

On the day of the incident, May 28, 1989, Bogenreif was also taken to the hospital. The penitentiary employee who transported Bogenreif asked him about his bandaged and bleeding hand. Bogenreif replied that he "used it on somebody's face." When the treating physician asked him the cause of his injury, Bogenreif again said "I used it on somebody's face."

Bogenreif was subsequently indicted by a grand jury on the charge of aggravated assault. Trial was held on November 30, 1989, and December 1, 1989, and Allen was called as the first witness. On cross-examination Bogenreif's counsel began questioning Allen about the fact that he was trans-

ferred out of the penitentiary to the Trustee Unit three months after the assault. The trial court, sua sponte, cut off the line of questioning. At a bench conference, within the hearing of the jury, the court stated "No. That's garbage. I'm going to overrule that testimony on my own motion. We'll be here until Monday if we start worrying about all that stuff." Defense counsel moved for a mistrial. The court denied the motion but did caution the jury to disregard comments to counsel from the bench, by reading the standard pattern jury instruction to the jury. On the following morning, the trial court began by apologizing, in front of the jury, to defense counsel for losing his patience the previous day.

In the course of settling jury instructions, defense counsel proposed two instructions on self-defense. The trial court denied both. On December 1, 1989, the jury convicted Bogenreif of aggravated assault. He was sentenced on January 8, 1990, to three years in the State Penitentiary, with the sentence to run consecutive to the sentence Bogenreif was previously serving. This appeal followed.

Bogenreif raises four issues on appeal:

1. Was there sufficient evidence to support a finding that Allen's injuries constituted "serious bodily injury"?

2. Did the trial court err by refusing to instruct the jury on self-defense?

3. Was Bogenreif denied an opportunity to cross-examine the complaining witness?

4. Did the trial court abuse its discretion by denying Bogenreif's motion for a mistrial?

■ For his first issue, Bogenreif argues that, as a matter of law, Allen's injuries do not constitute "serious bodily injury" under SDCL 22–18–1.1(4),[1] the statute under which he was convicted. This issue

---

1. SDCL 22–18–1.1(4) provides:
   Any person who:

   .  .  .  .  .

   (4) assaults another with intent to commit bodily injury which results in serious bodily injury; ...

is guilty of aggravated assault.

presents a question of whether the nature and extent of Allen's injuries constituted serious bodily injury, as a matter of law.

In *State v. Janisch*, 290 N.W.2d 473, 476 (S.D.1980), we held that the phrase "serious bodily injury" as used in SDCL 22–18–1.1(4) "is such injury as is grave and not trivial, and gives rise to apprehension of danger to life, health or limb." In *Janisch*, we reversed a conviction for aggravated assault where the victim's injuries were limited to "black and blue marks, a puffed eye, and a swollen or cut lip," characterizing such injuries as typical of simple assault. *Id.*

Bogenreif contends that because Allen's injuries were inflicted with his fists and are such as are likely to occur in a simple assault, the loss of teeth and facial scarring cannot constitute serious bodily injury. *See State v. Peters*, 274 Minn. 309, 143 N.W.2d 832, 837 (1966). He asks this court to limit the definition of "serious bodily injury" to include only injuries that are life threatening, injuries to internal organs, or injuries that require lengthy hospitalization. In *Janisch*, we required that the injury be grave, *and* that it give rise to an apprehension of a threat to life, health or limb. 290 N.W.2d at 476. The parties here do not dispute whether Allen was in apprehension of serious injury; rather, the dispute here focuses on whether the loss of permanent teeth, facial injuries, and a facial scar are grave injuries within the meaning of "serious bodily injury."

Other courts have been faced with the question of whether the loss of permanent teeth is sufficient to sustain a conviction of aggravated assault. The Minnesota Court of Appeals held that "the loss of a tooth is a permanent loss of the function of a bodily member," satisfying Minnesota's first degree assault statute. *State v. Bridgeforth*, 357 N.W.2d 393, 394 (Minn.Ct.App.1984), *rev. denied* (Minn. Feb. 6, 1985). In *Bridgeforth*, the statute defined "great bodily harm" to include injuries "which cause[ ] a permanent or protracted loss or impairment of the function of any bodily member or organ." *Id.* (brackets added); *see* Minn.Stat. § 609.02, subd. 8 (1982).

The Texas Court of Appeals has followed this same reasoning in interpreting its statute which defines serious bodily injury as one which involves "protracted loss or impairment of the function of any bodily member or organ." *Lenzy v. State*, 689 S.W.2d 305, 310 (Tex.Ct.App.1985); *see* Tex. Penal Code Ann. § 1.07(a)(34) (Vernon 1974). The *Lenzy* court held that injuries to teeth which did not result in tooth loss but did require extensive dental work were within the contemplated definition of "serious bodily injury." 689 S.W.2d at 310.

In conjunction with additional injuries, other courts have considered tooth loss or injury to be a relevant consideration in determining whether there is sufficient evidence to prove serious bodily injury. *See People v. Salas*, 143 Cal.Rptr. 755, 758–59, 77 Cal.App.3d 600, 602 (1978) (evidence of broken nose, loss of one tooth, and facial cuts requiring three or four stitches was sufficient to support jury finding of great bodily injury); *People v. Kinman*, 134 Cal. App.2d 419, 286 P.2d 28 (1955) (evidence that victim had four loose teeth, two black eyes, two cuts requiring stitches, and a large bruise sustained finding that assault resulted in great bodily injury); *People v. James*, 133 Cal.App.2d 478, 284 P.2d 527 (1955) (possible nose fracture, loose teeth, and black eye sustained finding of great bodily injury); *State v. Gillespie*, 445 N.W.2d 661 (S.D.1989) (fractured palate, in addition to broken rib, punctured lung, and cardiac tamponade); *Pitts v. State*, 742 S.W.2d 420 (Tex.Ct.App.1987) (extensive facial damage requiring braces); *Hatfield v. State*, 377 S.W.2d 647 (Tex.Crim.App.1964) (evidence that injured party had cut lip, lost some teeth, was hospitalized for one week, and had stiff neck was sufficient to sustain jury finding of serious bodily injury). *But see State in Interest of Besendorfer*, 568 P.2d 742, 744 (Utah 1977) (injury sustained in fist fight requiring capping of tooth insufficient to sustain a conviction for aggravated assault because no evidence that the injuries were life threatening, caused permanent disfigurement, or loss or impairment of limbs or organs).

Bogenreif argues that *Minnix v. State*, 282 P.2d 772 (Okla.Crim.App.1955), sup-

ports his contention that Allen's injuries are insufficient to support a conviction for aggravated assault. In *Minnix*, the victim's upper and lower lips were split, requiring several layers of stitches. *Id.* at 775–76. The court held that "the injury was not sufficient to cause apprehension of danger to *life*, health or body and hence there was no aggravated assault." *Id.* at 777 (emphasis in original). *Minnix* is not dispositive, however, because the victim's injuries in this case are greater. Allen's split lip required stitches and left a permanent scar. His front teeth were so badly damaged that they had to be removed, and two adjacent teeth were to be extracted after the trial. Allen's teeth were broken two-thirds of the way down the roots, and the fragments had to be surgically removed. Both dentists testified that Allen will have permanent difficulty eating, even with dentures.

Authority from other states supports the conclusion that whether injuries constitute "serious bodily injury" is a question for the jury. *Flores v. State*, 76 Wis.2d 50, 250 N.W.2d 720, 722–23 (1977) *overruled on other grounds State v. Richards*, 123 Wis.2d 1, 365 N.W.2d 7 (1985). We hold that evidence of the loss of teeth, coupled with a cut lip which resulted in a permanent scar is sufficient to sustain a jury's finding of serious bodily injury. Accepting the evidence in this case in the light most favorable to the verdict, the record reflects sufficient evidence upon which the jury could find that the injuries Bogenreif inflicted on Allen resulted in serious bodily injury.

■ Next, Bogenreif claims that the trial court erred in refusing his proposed jury instructions on self-defense.[2] "A defendant is entitled to an instruction on his [or her] theory of defense if there is evidence to support it and a proper request is made. Conversely, he [or she] is not entitled to an instruction if there is no evidence to support his [or her] theory." *State v. Esslinger*, 357 N.W.2d 525, 532 (S.D.1984) (cita-

tions omitted; brackets added); *See State v. Weatherford*, 416 N.W.2d 47 (S.D.1987); *State v. Kills Small*, 269 N.W.2d 771 (S.D. 1978); *State v. Zemina*, 87 S.D. 291, 206 N.W.2d 819 (1973). The defense of self-defense is available only to prevent imminent danger of great personal injury, SDCL 22–16–35, or to prevent an offense against one's self or property, SDCL 22–18–4. "Unless the individual situation required an immediate response necessary to prevent unlawful force from being inflicted upon [defendant] or another, the statute [SDCL 22–18–4] is not applicable." *State v. Rich*, 417 N.W.2d 868, 871 (S.D.1988).

■ Here, Bogenreif points to the testimony of Pace to support his claim of self-defense. Pace testified that Allen started the fight by pushing Bogenreif. According to Pace, Allen then retreated into his prison cell and attempted to close the door behind him, but Bogenreif pursued Allen into his cell, where Bogenreif then assaulted Allen. Our decision in *Rich* requires that Bogenreif provide some evidence that there was a threat of immediate danger to himself. Even accepting Pace's testimony as true, a simple shove does not as a matter of law give rise to a right to beat another to defend oneself. The trial court did not err in refusing to instruct on self-defense.

Bogenreif's last two issues concern an exchange between his attorney and the trial judge. The trial judge interrupted Bogenreif's attorney when he began questioning Allen about his transfer from the state penitentiary to the trustee unit. The exchange was as follows:

THE COURT: This is interesting but what difference does it make? Are we going somewhere with all this?

MR. LARSON: I think there's something to do with motive, Your Honor.

THE COURT: This is long after the incident. Long after the incident had been—the only thing I am thinking about—approach the bench. Maybe there is something I missed.

2. The jury instructions proposed by Bogenreif were S.D. Pattern Jury Instructions 2–9–1 and 2–9–2 (1989).

(Whereupon an off-the-record discussion was had at bench.)

(Within the hearing of the jury.)

THE COURT: No. That's garbage. I'm going to overrule that testimony on my own motion. We'll be here until Monday if we start worrying about all that stuff.

MR. LARSON: I'd like to ask for a mistrial at this point.

THE COURT: Denied.

As his third issue, Bogenreif contends that he was denied a full opportunity to question Allen. Bogenreif maintains that by limiting his cross-examination of the prosecution witness, he was denied the right to present his defense. Defense counsel made an offer of proof, contending that Allen had been given more favorable treatment in exchange for his testimony and that the possibility of such a benefit motivated Allen to provoke the fight. The court ruled that the evidence sought was irrelevant.

Bogenreif argues that he was denied an opportunity to impeach Allen's testimony on the grounds of bias or ulterior motive, basing his contention on primarily three cases: *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); and *Alford v. United States*, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1930).

As a factual matter, on direct examination Allen had previously testified that at the time of the incident he was incarcerated in the state penitentiary. He also testified that at the time of trial he had obtained trustee status and was serving his sentence at the detachment unit in Yankton, where he was allowed holiday furloughs. On cross-examination, Allen repeated these facts. Also, on cross-examination, defense counsel elicited from Allen statements that he was presently serving a prison term for grand theft. Additionally, Allen was questioned both on direct and cross-examination regarding the matter of his letters to authorities disclaiming responsibility for fights which he predicted might occur between him and other prisoners, including Bogenreif. These facts had all been elicited prior to the time when the trial court limited defense counsel's questioning.

■ Bogenreif's right to confront witnesses testifying against him is guaranteed by the Sixth Amendment to the federal constitution and by Article VI, § 7 of the state constitution. "[E]xposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Van Arsdall*, 475 U.S. at 678–79, 106 S.Ct. at 1435, 89 L.Ed.2d at 683 (quoting *Davis*, 415 U.S. at 316–17, 94 S.Ct. at 1110, 39 L.Ed.2d at 354); *see State v. Grooms*, 399 N.W.2d 358 (S.D.1987). However, trial courts have broad discretion to impose limits on cross-examination of witnesses for potential bias. *Van Arsdall*, 475 U.S. at 679, 106 S.Ct. at 1435, 89 L.Ed.2d at 683; *Davis*, 415 U.S. at 316, 94 S.Ct. at 1110, 39 L.Ed.2d at 353; *Alford*, 282 U.S. at 694, 51 S.Ct. at 220, 75 L.Ed. at 629; *Grooms*, 399 N.W.2d at 362.

■ Here, defense counsel had already been permitted to expose to the jury facts from which they could judge Allen's credibility. *See Davis*, 415 U.S. at 318, 94 S.Ct. at 1111, 39 L.Ed.2d at 355; *Grooms*, 399 N.W.2d at 362. The line of questioning probably was irrelevant in that regard. In our view, Bogenreif was permitted the opportunity to cross-examine Allen to impeach his credibility. The mere fact that Bogenreif was not allowed to pursue a line of questioning that the fight was initiated by Allen so that he could secure better treatment, does not violate the Confrontation Clause. As the United States Supreme Court has stated, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15, 19 (1985) (citations omitted; emphasis in original). Here, a reasonable jury probably would not have had a significantly different impression of Allen's credibility if the proposed line of cross-examination had been permitted. Accordingly, the limitation imposed on the cross-examination in

this case was within the discretion of the trial court.

Finally, Bogenreif maintains that he was entitled to a mistrial after the trial court, within earshot of the jury, said "that's garbage," when referring to his line of questioning which it was terminating. After the jury was excused from the courtroom, the court and counsel discussed the matter more fully. When the jury returned, the trial court instructed the jury that arguments between the parties and judicial comments should not be held against the defendant. This instruction was repeated again prior to the jury's deliberation. In addition, on the following morning, before proceeding with the trial, the court apologized to defense counsel in the presence of the jury.

Frankly, the members of this court were dismayed by the trial court's remarks, made in the courtroom, where there is even a possibility that the jury could hear them. As former trial judges and trial counsel, we are aware that tension can build up in the course of the conduct of a trial. Each trial lawyer may have his own style of presenting his case, but it is hardly the place of his opponent, or more certainly the trial judge, who supposedly occupies the position of unbiased arbiter, to criticize that lawyer's methods in public and before the jury that is to determine the factual disputes. It is the trial judge whom the jury looks to for guidance. His use of intemperate language regarding the presentation by one counsel is a serious breach of courtroom conduct and decorum. Perhaps the saving grace is that he had the good sense to make an apology to counsel in the presence of the jury and to instruct them to disregard his remarks.

■ Trial courts have broad discretion in ruling on a motion for a mistrial, and the lower court's decision will not be disturbed unless we are convinced that there has been a clear abuse of judicial discretion. *State v. McDowell*, 391 N.W.2d 661, 666 (S.D.1986). Furthermore, there must be an actual showing of prejudice to justify the granting of a mistrial. *Id.; State v. High Elk*, 298 N.W.2d 87, 89 (S.D.1980).

■ Bogenreif did not make any showing of actual prejudice to fortify his motion. His motion for a mistrial was based primarily on his belief that, in ruling that the evidence was irrelevant and by referring to it as "garbage," the trial court belittled defense counsel in front of the jury. Given the corrective procedures implemented, the insignificance of calling irrelevant questions garbage when compared to the evidence of Bogenreif's guilt, and the absence of a showing of prejudice or bad faith on behalf of the trial court, we conclude that the trial court did not abuse its discretion in denying Bogenreif's motion for a mistrial. *See McDowell*, 391 N.W.2d at 666. We point out, however, that our decision here in no way is intended to condone the conduct of the trial court in this case.

We affirm the conviction in all respects.

All the Justices concur.

HERTZ, Circuit Judge, acting as a Supreme Court Justice, not having been a member of the court at the time this case was considered, did not participate.