Troy NIXON, Appellant,

v.

UNITED STATES, Appellee.

No. 98–CF–115.

District of Columbia Court of Appeals.

Argued Feb. 18, 1999.

Decided April 15, 1999.

Dennis M. Hart, Washington, DC, for appellant.

Stefanie Roemer, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Thomas C. Black, and Demaurice F. Smith, Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB and REID, Associate Judges, and PRYOR, Senior Judge.

REID, Associate Judge:

After a jury trial, appellant Troy Nixon was convicted of four counts of assault with intent to kill DeMetrius Spencer, Aman Ball,[1] Joseph Jones and Robert Tay-

---

1. Mr. Ball's name also appears in the record and briefs as "Amon Bell" and "Amon Ball."

lor while armed, in violation of D.C.Code §§ 22–501, –3202 (1996); three counts of aggravated assault of Mr. Spencer, Mr. Ball and Mr. Jones while armed, in violation of §§ 22–504.1, –3202; one count of mayhem (of Mr. Spencer) while armed, in violation of §§ 22–506, –3202; three counts of possession of a firearm during a crime of violence (assault with intent to kill while armed, aggravated assault while armed, and mayhem while armed), in violation of §§ 22–3204(b); one count of carrying a pistol without a license, in violation of § 22–3204(a); one count of possession of an unregistered firearm, in violation of § 6–2311(a); and one count of possession of unregistered ammunition, in violation of § 6–2361(3).[2] He raises six arguments on appeal in an effort to obtain a new trial or to vacate certain of his convictions: (1) the trial court erred in failing to grant his motion for judgment of acquittal as to the charges of assault with intent to kill while armed and aggravated assault while armed; (2) certain of his assault and weapons charges merge; (3) the trial court erred in failing to limit the government's cross-examination of the central defense witness; (4) the trial court failed to keep its commitment to voir dire him on his decision not to testify; (5) the trial court erred in not conducting an inquiry into his request for a missing witness instruction; and (6) the trial court's *Winters*[3] instructions to the jury during its deliberations effectively coerced the verdict against him. We discuss the first two arguments in some detail. With respect to the first argument, we reverse Nixon's convictions for aggravated assault of Mr. Jones and Mr. Ball while armed because the government failed to prove that they suffered "serious bodily injury" within the meaning of §§ 22–504.1, –3202. As to the second argument regarding merger of certain of Nixon's convictions, we remand the case to

the trial court, with instructions to vacate either Nixon's conviction for mayhem of Mr. Spencer while armed or aggravated assault of Mr. Spencer while armed and to merge his possession of a firearm during crime of violence convictions into one PFCV conviction. We discuss the third through sixth arguments summarily and find no error as to them. Accordingly, we affirm the trial court's judgment in part, and reverse it in part and remand it for further proceedings consistent with this opinion.

### FACTUAL SUMMARY

The government's evidence showed that on October 8, 1996, a car owned by Robert Taylor was driven to 16th and U Streets, S.E., near Tony's market, by DeMetrius Spencer. Inside the car were four young men, Mr. Spencer, Mr. Taylor, Aman Ball and Joseph Jones. According to the testimony of Mr. Taylor, before the young men were able to get out of the car, the "car was shot up." Later, Mr. Taylor noticed that there were "bullet holes all around [his] car."

Mr. Taylor was asked during his testimony: "[D]id you see anybody in this courtroom who you saw that night?" He responded: "I wasn't really sure that I saw him. I'm not going to say something that I don't know." However, when confronted with his January 27, 1997 grand jury testimony, Mr. Taylor acknowledged that he was asked: "[D]o you recall telling the ladies and gentlemen of the grand jury that it was Troy Nixon who shot at you on October of 1996, correct?" Mr. Taylor replied: "Yes, that is correct." He also admitted that he did not "express any hesitancy that it was Troy Nixon." Although the windows of Mr. Taylor's car were tinted, he said: "I tint the windows real light, you know. You could see in and

---

**2.** Nixon was sentenced to concurrent terms of fifteen years to life for each assault with intent to kill while armed, each aggravated assault while armed, and mayhem while armed; five to fifteen years for each possession of a firearm during a crime of violence; twenty months to five years for carrying a pistol

without a license; and one year each for possession of an unregistered firearm and possession of unregistered ammunition.

**3.** *Winters v. United States,* 317 A.2d 530 (D.C. 1974) (en banc).

out of the car . . ." At the time of the trial, Mr. Taylor had known Troy Nixon for some ten years. The relationship between the two men was not good. Indeed, Mr. Taylor, Spencer, Jones and Ball "[were] having problems" with Nixon.

When the shooting started, Mr. Taylor "jumped out, rolled out of the car" and headed for an elementary school. As he ran, he saw "two people running behind [him]." Because of his asthma, Mr. Taylor "gassed out and gave up [running]." The men turned out to be Mr. Ball and Mr. Jones. Mr. Taylor noticed that: "[Mr. Jones] had a hole right here. And a hole coming out behind his ear and it was blood coming out."[4] Mr. Ball "was grabbing his shoulder and the back of his shirt was bleeding like he got hit in the back of his neck or his shoulder." Mr. Taylor continued to run toward the elementary school and eventually found a police officer. He told the officer that his "car was shot up and [his] friends were hurt." He informed the officer that Mr. Spencer was still in the car and was hurt.

Metropolitan Police Department Officer Vincent Tucci testified that when he arrived at the crime scene, he saw Mr. Spencer, who appeared to be seriously injured. Paramedics were attending him. It was discovered, later, that Mr. Spencer was paralyzed. Officer Calvin Hopkins, who also went to the crime scene, stated that he saw a car with bullet holes in the front windshield, both sides of the rear mirror, the passenger side window, the front driver's door and the rear passenger's door. Bullets were found in the rear of the car; the rear windows were shattered, and shell casings were found on the ground.

## ANALYSIS

*Appellant's Challenge To His Assault With Intent To Kill While Armed and Aggravated Assault While Armed Convictions*

Nixon contends that the trial court erred in failing to grant his motion for judgment

of acquittal on three of the assault with intent to kill while armed ("AWIKWA") charges—those pertaining to Mr. Taylor, Jones and Ball. He asserts that the government failed to show his specific intent to kill these three individuals. The government argues that the evidence was sufficient to establish specific intent with respect to all of the AWIKWA offenses, and thus, that the trial court did not err in denying Nixon's motion for judgment of acquittal. We agree with the government's position.

" 'In reviewing [the denial of a motion for judgment of acquittal based on] the sufficiency of evidence presented at trial we must consider the evidence in the light most favorable to the government to determine if it was sufficient to permit reasonable jurors to find guilt beyond a reasonable doubt.' " *Zanders v. United States,* 678 A.2d 556, 562 (D.C.1996) (quoting *United States v. Thomas,* 987 F.2d 697, 704 (11th Cir.1993) (quoting *Dyson v. United States,* 450 A.2d 432, 436 (D.C. 1982) (citation omitted))). "Moreover, 'it is only where the government has produced no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt that this court can reverse a conviction.' " *Id.* (quoting *Gayden v. United States,* 584 A.2d 578, 580 (D.C.1990) (citation omitted)).

To prove the AWIKWA charges with respect to Mr. Taylor, Jones and Ball, the government had to show beyond a reasonable doubt that Nixon: (1) made an assault on the three men; and (2) did so with specific intent to kill; (3) while armed. D.C.Code §§ 22–501, –3202. Reasonable jurors could find beyond a reasonable doubt that Nixon made an assault on the three men because he shot at the back, front and sides of Mr. Taylor's car in which the men were seated as the firing began. To prove a specific intent to kill,

---

4. The trial transcript is silent as to the loca-   tion of the second hole.

the government is not required to show that the accused actually wounded the victim. *Bedney v. United States*, 471 A.2d 1022, 1024 (D.C.1984) ("[A] lethal intent can be demonstrated without showing that the assailant succeeded in wounding his intended victim.") (citations omitted). Nor must testimony be presented by the victim at trial since specific intent may be shown through circumstantial evidence. *See Jones v. United States*, 516 A.2d 929, 931 (D.C.1986), *cert. denied*, 481 U.S. 1054, 107 S.Ct. 2193, 95 L.Ed.2d 848 (1987).

■ In this case, Nixon and the men who occupied Mr. Taylor's car, were having problems. Although the windows of Mr. Taylor's car were tinted, the tint was light and Nixon could look into the car and see its occupants. Moreover, when Nixon started to fire at Mr. Taylor's car, he placed all of its occupants in "a zone of harm." In *Ruffin v. United States*, 642 A.2d 1288 (D.C.1994), we recognized that:

> [w]here the means employed to commit the crime against a primary victim created a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone.

*Ruffin, supra*, 642 A.2d at 1298 (citation omitted). In short, sufficient evidence was presented by the government at trial to satisfy the element of specific intent to kill Mr. Taylor, Jones and Ball beyond a reasonable doubt. Consequently, we affirm Nixon's convictions for assault with intent to kill these men while armed.

Nixon also challenges his aggravated assault while armed convictions with respect to Mr. Jones and Mr. Ball on the ground that the government failed to prove an essential element of aggravated assault while armed—"serious bodily injury." To prove aggravated assault while armed beyond a reasonable doubt, the government had to show that Nixon: (1) caused serious bodily injury to Mr. Jones and Mr. Ball; and (2) either "knowingly or purposely cause[d] serious bodily injury to [them]"; or "[u]nder circumstances manifesting extreme indifference to human life, ... intentionally or knowingly engage[d] in conduct which create[d] a grave risk of serious bodily injury to [them], and thereby cause[d] serious bodily injury"; (3) while armed. D.C.Code § 504.1, –3202.

The term "serious bodily injury" is not defined in § 22–504.1. However, the term is defined in a statute pertaining to sentencing for a sex offense, § 22–4101(7) as:

> bodily injury that involves a substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ or mental faculty.

The factors of substantial risk of death, disfigurement, and impairment of the functions of a bodily member or organ, appear in statutes in the majority of states that define "serious bodily injury", and also in the Model Penal Code.[5] For example, Texas defines the term to mean:

> [B]odily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the functions of any bodily member or organ.

V.T.C.A., Penal Code, § 1.07(a)(34). The Minnesota definition reads:

> [B]odily injury which creates a high probability of death, or which causes serious permanent disfigurement, or which causes a permanent or protracted loss or impairment of the function of any
>
> (A) a substantial risk of death;
> (B) extreme physical pain;
> (C) protracted and obvious disfigurement; or
> (D) protracted loss or impairment of the function of a bodily member, organ, or mental faculty.

---

5. The element of "serious bodily injury" as it appears in the federal carjacking statute, 18 U.S.C. § 2119, is defined in 18 U.S.C. § 1365(g)(3), the penal code provision concerning tampering with consumer products:

> (3) The term "serious bodily injury" means bodily injury which involves—

bodily member or organ or other serious bodily harm.

Minn.Stat. § 609.02, subd. 8 (1982). The Connecticut definition is:

[P]hysical injury which creates a substantial risk of death or which causes serious physical disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ.

Conn. General Statutes § 53a–3 (4). The pertinent Alabama statute defines "serious bodily injury" as:

Physical injury which creates a substantial risk of death, or which causes serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ.

Code of Alabama § 13A–1–2 (9) (1975). The Model Penal Code states:

Serious bodily injury means bodily injury which (1) creates a substantial risk of death; (2) causes serious permanent disfigurement; or (3) causes protracted loss or impairment of the functions of any bodily member or organ.

Model Penal Code, MPC § 210.0(3). In sum, the majority of jurisdictions that define "serious bodily injury" require an injury that causes a substantial risk or high probability of death; or a serious permanent or physical disfigurement, or a protracted loss or impairment or serious impairment of the functions of a bodily member or organ.

■ Since the definition of "serious bodily injury" which appears in § 22–4101(7) of the District's sexual abuse statute, *infra*,[6] is consistent with that followed in the majority of jurisdictions, we adopt it for the purpose of determining whether the government met its burden to prove "serious bodily injury" under the aggravated assault statute. Viewed in the light most favorable to the government, the only evidence presented as to the injuries of Mr. Jones and Mr. Ball came during the testimony of Mr. Taylor. He stated that he saw two holes on Mr. Jones' body, including "a hole coming out behind his ear [with] blood coming out"; and that Mr. Ball "was grabbing his shoulder and the back of his shirt was bleeding like he got hit in the back of his neck or his shoulder." Both men were able to run after the shooting and thus were not unconscious and did not manifest immobilizing pain. Neither Mr. Jones nor Mr. Ball testified, and no medical evidence was introduced through health professionals who treated either man, or through any of their medical records. Thus, the record on appeal is silent as to how the holes on Mr. Jones' body affected him. In the case of Mr. Ball, the record reveals no direct evidence that he suffered any bullet wound. However, given Mr. Taylor's testimony that Mr. Ball "was grabbing his shoulder and the back of his shirt was bleeding," the government is entitled to an inference that he was shot. Nonetheless, no evidence presented at trial permitted a reasonable juror to infer that his injury, or those suffered by Mr. Jones, posed "a substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ or mental faculty." D.C.Code § 22–4101(7).

In *Williams v. State*, 696 S.W.2d 896 (Tex.Crim.App.1985), the court reversed a conviction for aggravated assault due to the insufficiency of the evidence even though hospital records revealed two bullet wounds and one "hole" on the victim's person. The court stated:

A knife wound, or a gunshot wound, although caused by a deadly weapon such as a knife or gun, is not, per se, serious bodily injury. The shooting of an individual is a serious and grave matter. Yet, it is the burden of the State to

---

6. One of the aggravating circumstances of the sentencing section of the sexual abuse statute, § 22–4120(3), is that "[t]he victim sustained serious bodily injury as a result of the offense."

prove that such an act created a substantial risk of death, or caused death, a serious permanent disfigurement, or protracted loss or impairment of the functions of any bodily member or organ. See V.T.C.A. Penal Code, Sec. 1.07(a)(34).

696 S.W.2d at 898. In *Reyes v. State*, 1997 WL 81260 (Tex.App.–San Antonio1997), the court affirmed a conviction for aggravated assault where a bullet was not removed from the victim's abdomen due to his fear of surgery, and uncontroverted medical testimony stated that the bullet wound to the victim's abdomen "was serious and that, given the legal definition of serious bodily injury, ... [it] constituted serious bodily injury." 1997 WL 81260 at *3. The court affirmed a conviction in *Haslerig v. State*, 474 So.2d 196 (Ala.Crim. App.1985) where the victim testified that he was shot in the chest, hospitalized, unable to work for five weeks due to pain and weakness, unable to sleep for four weeks without medication because of pain, and where two obvious scars appeared on the victim's body at the point bullets entered and exited. In that case, a thoracic surgeon testified that the victim could be in pain for a couple of months and possibly would have a lot of scar tissue, although gross disfigurement might not result. In *Jones v. United States*, — U.S. —, 119 S.Ct. 1215, 1218, 143 L.Ed.2d 311 (1999), a case involving the federal carjacking statute, a victim was found to have suffered serious bodily injury because petitioner's gun "caused profuse bleeding in [the victim's ear], and ... a physician ... concluded that [the victim] had suffered a

perforated eardrum, with some numbness and permanent hearing loss."

■ In light of these cases, and under the definition of "serious bodily injury" as set forth in § 22–4101(7), the government in this matter failed to present sufficient evidence to show that Mr. Jones's and Mr. Ball's injuries involved a substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the functions of a bodily member, organ, or mental faculty. Nor did the government present sufficient evidence to satisfy the definition of "serious bodily injury" adhered to in a minority of jurisdictions that have defined the term.[7] Simply put, due to the absence of testimony from Mr. Jones or Mr. Ball, or from health professionals who treated them, or medical records detailing the nature and extent of their injuries, the government failed to sustain its burden to show beyond a reasonable doubt that Mr. Jones and Mr. Ball suffered serious bodily injury due to the multiple shots Nixon fired at the car in which they were seated. Therefore, we are constrained to reverse the convictions of Nixon for aggravated assault while armed on Mr. Jones and Mr. Ball.

### Appellant's Merger Arguments

■ We review the issue regarding the merger of Nixon's convictions *de novo*, *Spain v. United States*, 665 A.2d 658, 661 n. 5 (D.C.1995), to determine whether there has been a violation of the Double

---

7. Tennessee defines the term "serious bodily injury" as:

> a cut, abrasion, bruise, burn or disfigurement; physical pain or temporary illness or impairment of the function of a bodily member, organ or mental faculty, which involves a substantial risk of death, protracted unconsciousness, extreme physical pain, protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty.

T.C.A. § 39–13–102 (Supp.1993), 39–11–106(a)(2)(33) (1991). South Dakota defines "serious bodily injury" as "such injury as is grave and not trivial, and gives rise to apprehension of danger to life, health or limb." *State v. Bogenreif*, 465 N.W.2d 777, 780 (S.D. 1991) (quoting *State v. Janisch*, 290 N.W.2d 473, 476 (S.D.1980)). The issue in *Bogenreif* was what constitutes a "grave" injury. The court "h[e]ld that evidence of the loss of teeth, coupled with a cut lip which resulted in a permanent scar is sufficient to sustain a jury's finding of serious bodily injury." *Id.* at 781.

Jeopardy Clause of the Fifth Amendment to the Constitution of the United States.

*Aggravated Assault While Armed and Mayhem While Armed*

Nixon maintains that his convictions for aggravated assault of Mr. Spencer while armed and mayhem of Mr. Spencer while armed merge. The government agrees. Consequently, one of these convictions must be vacated. *See Moore v. United States,* 599 A.2d 1381, 1383 (D.C.1991) (citing *Edwards v. United States,* 583 A.2d 661, 668 (D.C.1990)).

*Aggravated Assault While Armed (AAWA) and Assault With Intent To Kill While Armed (AWIKWA)*

■ Nixon's contention that his AAWA and AWIKWA convictions merge now pertains only to Mr. Spencer since we conclude that his convictions for aggravated assault of Mr. Jones and Mr. Ball while armed must be reversed. We find no merit to the argument that AAWA and AWIKWA convictions merge under the reasoning of *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932). *Blockburger* held that:

> [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

284 U.S. at 304, 52 S.Ct. 180. The elements of proof and the underlying facts are not the same for AAWA and AWIKWA. Unlike AWIKWA, AAWA requires a showing of facts that prove serious bodily injury. Similarly, AWIKWA requires proof of facts showing specific intent whereas there is no specific intent requirement for AAWA. Hence, the two crimes do not merge under the *Blockburger* test.

*Possession of a Firearm During a Crime of Violence (PFCV)*

Nixon's argument that his three convictions for PFCV merge into one has merit. Only one gun was used during the crimes committed by Nixon and thus, he asserts, there can be only one conviction for PFCV. The government argues, however, that the Congress of the United States "intended for the number of violations to turn, not on the number or type of weapons in one's possession, but rather, the number of violent or dangerous crimes committed." Therefore, the government maintains, "Congress intended for multiple predicate offenses to trigger multiple violations of § 22–3204(b)." As indicated previously, the government concedes that Nixon's convictions for mayhem while armed and aggravated assault while armed merge. The government also "concede[s] that one of [Nixon's] PFCV convictions—whether that based upon Mayhem While Armed or that based upon AAWA—must be vacated." The government "do[es] not agree[, however,] that the two remaining PFCV convictions merge." [8]

To support its argument that the PFCV convictions do not merge, the government relies on *United States v. Anderson,* 313 U.S.App. D.C. 335, 59 F.3d 1323 (en banc), *cert. denied,* 516 U.S. 999, 116 S.Ct. 542, 133 L.Ed.2d 445 (1995), a case involving the federal counterpart of § 22–3204(b)— 18 U.S.C. § 924(c). *Anderson* held that "only one § 924(c)(1) violation may be charged in relation to one predicate crime." 313 U.S.App. D.C. at 346, 59 F.3d at 1334. However, the court in *Anderson* reversed three of appellant's § 924(c)(1) convictions. 313 U.S.App. D.C. at 336, 59 F.3d at 1324. The District of Columbia circuit had occasion to discuss *Anderson* in a later case in which appellant was convicted of two counts of PFCV based upon separate predicate offenses, even though there was only one use of a gun. In

---

8. Nixon was convicted of three PFCV violations—that is, possession of a firearm while committing AAWA, AWIKWA and Mayhem.

commenting on *Anderson,* the court said in *United States v. Wilson,* 333 U.S.App. D.C. 103, 160 F.3d 732, 749 (1998):

> While the holding in *Anderson* does not compel that one of [appellant's] § 924(c) convictions be vacated, because there are two predicate offenses that purportedly give rise to two § 924(c) violations, the reasoning underlying the [e]n banc court's decision is no less applicable where a single use of a gun results in more than one offense.... [O]ur reasoning in *Anderson* and its application of the rule of lenity lead us to vacate one of [appellant's] § 924(c) convictions.

333 U.S.App. D.C. at ——, 160 F.3d at 749.

This case differs from *Wilson, supra,* in that, during Nixon's single possession of a firearm, he shot into a car containing several individuals and was subsequently convicted of predicate counts against each of those four individuals. The crimes which serve as a basis for the two remaining PFCV counts involved separate victims.[9] *See, e.g., United States v. Andrews,* 75 F.3d 552, 557–58 (9th Cir.1996) (holding, somewhat reluctantly, that under circumstances similar to those here presented, convictions of possessory weapons offenses did not merge). Nevertheless, the District's legislature (the Council of the District of Columbia) has not clearly or unequivocally stated that a single possession of a single weapon during a single violent act may give rise to multiple PFCV prosecutions, and under the circumstances presented in this case, the rule of lenity should be applied.[10] *Anderson, supra,* 313 U.S.App. D.C. at 345, 59 F.3d at 1333.

The rule of lenity should be applied in this case, first, because the government's view that the two remaining PFCV convictions do not merge into one "would raise [a] serious constitutional question[ ] [under the Double Jeopardy Clause of the Fifth Amendment to the Constitution] on which precedent is not dispositive." *Jones, supra,* 119 S.Ct. at 1228. "Any doubt on the issue is to be resolved in favor of avoiding those questions." *Id.* Thus, to avoid constitutional doubt in Nixon's case, we apply the rule of lenity. Second, especially in identifying legislative intent with respect to the proper unit of prosecution, "[i]t may fairly be said to be a presupposition of our law to resolve doubts in the enforcement of a penal code against the imposition of harsher punishment." *Id.* (quoting *Bell v. United States,* 349 U.S. 81, 83, 75 S.Ct. 620, 99 L.Ed. 905 (1955)). Indeed, the government does not claim in this case that firing simultaneously at several victims gives rise to multiple PFCV's, and the grand jury did not return indictments based on any such theory. Accordingly, based on the application of the doctrine of lenity, Nixon's PFCV convictions merge into one PFCV conviction.

### Nixon's Other Arguments

Nixon's remaining arguments may be disposed of summarily. We review his contention of trial court error with respect to the government's alleged improper impeachment of a central defense witness, Zenita Razanders who was the girlfriend of Nixon at the time he fired at Mr. Taylor's car, for plain error because

---

9. One of the PFCV's is predicated on the merged aggravated assault/mayhem count committed against Spencer, and the other stems from the AWKWA's directed against all four victims.

10. In a footnote to our decision in *Hanna v. United States,* 666 A.2d 845 (D.C.1995), we discussed PFCV counts pertaining to two incidents which occurred about fifty minutes apart with the same weapon in different parts of the same apartment building. We did not merge the two PFCV counts because we rec-

ognized the doctrine of "fresh impulse" and concluded that the decision to possess the weapons during the second incident constituted a fresh impulse. Nonetheless, we noted that "[o]ne could arguably view the actions underlying the PFCV counts to be one continuous possession" which would cause a merger of the two counts. 666 A.2d at 854–55. Nixon's case differs from *Hanna* because there was only one incident rather than two incidents separated by time and location.

the defense failed to object to the government's cross-examination during trial. *See Hunter v. United States*, 606 A.2d 139, 144 (D.C.), *cert. denied*, 506 U.S. 991, 113 S.Ct. 509, 121 L.Ed.2d 444 (1992). The government presented direct and circumstantial evidence of Nixon's guilt and did not rely on its cross-examination of Ms. Razanders in making its closing argument. Therefore, even assuming error, without deciding, we cannot say that Nixon's "substantial rights were so clearly prejudiced that the very fairness and integrity of the trial was jeopardized." *Id.* (citation omitted).

Nixon's argument that the trial court erred in failing to keep its commitment to voir dire him on his decision not to testify has no support in the record. While the jurors were deliberating, the trial judge questioned Nixon about his decision not to testify, and advised him that: "Only you can make the final decision as to whether to testify or not." Nixon acknowledged that his attorney informed him that the decision whether to testify was his alone to make; he decided not to testify; and he remained "comfortable" with that decision. Consequently, no error occurred. *See Moctar v. United States*, 718 A.2d 1063, 1068 (D.C.1998) ("There is no blanket requirement that the validity of a waiver [of the right to testify] be determined at trial.").

▮ Nixon's assertion that the trial court erred in failing to conduct an inquiry into his request for a missing witness instruction is not persuasive. Defense counsel made the request for a missing witness instruction just prior to closing arguments. In making the request, defense counsel stated that she "just want[ed] to comment on the fact that [the complaining witnesses who did not testify were] here [that is, in the courtroom]." We have stated that the decision to give a missing witness instruction or to allow counsel to make a missing witness argument is committed to the sound discretion of the trial court. *See Reyes–Contreras v. United States*, 719 A.2d 503, 508 (D.C.1998) (citing *Thomas v.*

*United States*, 447 A.2d 52, 58 (D.C.1982)). Moreover, on the record before us, we cannot say that defense counsel made the requisite showing "that the missing witness[es] ... [were] 'peculiarly available'" to the government. *Id.* (quoting *Arnold v. United States*, 511 A.2d 399, 415 (D.C. 1986)). Thus, we cannot say that the trial court abused its discretion in denying Nixon's request for a missing witness instruction.

Finally, Nixon argues that the trial court erred in giving a *Winters* instruction to the jury which "effectively coerced" the verdict against him. In this case the jury began its deliberations at 10:25 a.m. on November 17, 1997. At 3:10 p.m. that same day the jury sent a note to the judge stating that it was deadlocked and asking: "What happens next?"[11] The judge instructed his courtroom clerk to tell the jury to continue deliberating. Shortly thereafter the judge called the jurors into the courtroom to dismiss them for the day. He told them in part:

> Well, if I agreed with your assessment that you were hopelessly deadlocked then what would happen is that I would declare a mistrial, declare that this was a hung jury. ... However, at this stage I don't agree with your assessment of little prospect. And therefore, I ask you to return tomorrow at 9:30 to continue your deliberations.

The next morning the jury began deliberations at 9:35 a.m. At 11:52 a.m. the jury sent a note advising the judge in part that: "[T]here is no possibility of unanimity on the verdict, and that is the only thing of which we are all in agreement." After determining that the jury had been "deliberating", the judge gave the *Winters* instruction. After lunch, the jury deliberated for about one hour before returning a guilty verdict on all counts.

▮ This case closely resembles *Coleman v. United States*, 515 A.2d 439 (D.C. 1986), *cert. denied*, 481 U.S. 1006, 107 S.Ct. 1631, 95 L.Ed.2d 205 (1987). In *Coleman*, the jury advised the court three times that

---

**11.** In its first note the jury asked the judge a question concerning "reasonable doubt."

it would be "unable to reach a decision." The jury deliberated about nine to ten hours in total. The first note came after two hours of deliberation; the judge spoke to the jurors and then dismissed them for the day. After an additional two and one quarter hours on the second day of deliberation, the jury sent a second note and the judge again instructed that the deliberations continue. The third note was sent in the afternoon of the second day of deliberation; the judge gave the *Winters* instruction. The next morning the jury reached a verdict. In reviewing *Coleman,* we said: "[T]he court's decision to give the *Winters* instruction when it did was well within its discretion and did not result in a coerced verdict." *Coleman, supra,* 515 A.2d at 453. The same is true in Nixon's case. *See also Chavarria v. United States,* 505 A.2d 59, 64–65 (D.C.1985) (no coercion where jury returned guilty verdict an hour and a half after the *Winters* instruction). In short, nothing in the record on appeal persuades us that the trial judge coerced the jury's verdict by giving the *Winters* instruction.

Accordingly, for the foregoing reasons, we reverse Nixon's convictions for aggravated assault of Mr. Jones and Mr. Ball while armed because the government failed to prove that they suffered "serious bodily injury" within the meaning of D.C.Code §§ 22–504.1, –3202. In addition, we remand the case to the trial court, with instructions to vacate either Nixon's conviction for mayhem of Mr. Spencer while armed or aggravated assault of Mr. Spencer while armed and to merge his possession of a firearm during crime of violence convictions into one PFCV conviction.[12] In all other respects we affirm the trial court's judgment.

*So ordered.*

12. The trial court should re-sentence Nixon and may, in its discretion, alter his sentences. Since, as originally sentenced, Nixon's sentences run concurrently, no alteration of the time to be served is required.