553 So.2d 719 (1989)
Theresa JACKSON, Appellant,
v.
STATE of Florida, Appellee.
No. 88-0264.
District Court of Appeal of Florida, Fourth District.
December 13, 1989.
Richard G. Lubin and Thomas C. Gano of Lubin and Mincberg, P.A., West Palm Beach, for appellant.
Robert A. Butterworth, Atty. Gen., Tallahassee, and Richard L. Polin, Asst. Atty. Gen., Miami, for appellee.
PER CURIAM.
We affirm the judgment of conviction entered on all counts and address only the point raising error in the admission of testimony from the state's expert psychologist which was offered to prove that the appellant was guilty of child abuse, pursuant to section 827.04(1), Florida Statutes (1985).
The expert psychologist specialized in suicidology and, for purposes of this trial, performed a psychological autopsy on appellant's seventeen-year-old daughter who had committed suicide in March of 1986. His testimony explained that a psychological autopsy is a retrospective look at an individual's suicide to try to determine what led that person to choose death over life. In order to make that determination, *720 in this case, the expert reviewed the child's school records, the police records surrounding this case, including all of the state's evidence and all of the defendant's statements and medical records, an incident report from an earlier suicide attempt by the child and various testimony from the witnesses appearing at this trial. However he admitted that he did not personally interview any of the witnesses who appeared at trial nor did he ever meet or interview the suicide victim. His opinion, bounded by reasonable psychiatric certainty, was that the nature of the relationship between the defendant and her daughter was a substantial contributing factor in the daughter's decision to commit suicide.
Having reviewed the record, we are satisfied that the state presented sufficient evidence to establish that psychological autopsy is accepted in the field of psychiatry as a method of evaluation for use in cases involving suicide and that the trial judge acted within his discretion in admitting this evidence at trial. Sections 90.402; 90.403; 90.702; 90.704, Fla. Stat. (1987).
With regard to the concerns of the defense that the psychological autopsy was not established as reliable before it was admitted into evidence, we note that such opinions are subjective and therefore the issue of reliability is best left to the jury. Further, we perceive no distinction between the admission of the expert's opinion in this case and, for example, admitting psychiatric opinion evidence to establish a defendant's sanity at the time of committing an offense or to prove the competency of an individual at the time of executing a will. See Morgan v. State, 537 So.2d 973 (Fla. 1989); United States v. Edwards, 819 F.2d 262 (11th Cir.1987); see also Kruse v. State, 483 So.2d 1383 (Fla. 4th DCA 1986); Terry v. State, 467 So.2d 761 (Fla. 4th DCA 1985); In re Estate of Hammermann, 387 So.2d 409 (Fla. 4th DCA 1980).
There being no merit to the other arguments raised, we affirm the judgment of conviction.
AFFIRMED.
WALDEN and GUNTHER, JJ., concur.
GLICKSTEIN, J., concurs specially with opinion.
GLICKSTEIN, Judge, concurring specially.
As the parties point out this case raises an issue of first impression. Specifically, the issue is whether a psychological autopsy performed on a suicide victim is proper evidence in a criminal case charging the defendant with child abuse in the form of the defendant causing her seventeen-year-old daughter mental injury by requiring her to work as a strip dancer to earn money, and that the defendant's demands on the child caused her such stress that she took her own life to escape the situation.

I
I agree that we need only address one of the issues raised by appellant on appeal; and that the trial court did not abuse its discretion in admitting the testimony of Dr. Douglas George Jacobs.
In Johnson v. State, 393 So.2d 1069, 1072 (Fla. 1980), the supreme court said:
The trial court has broad discretion in determining the range of subjects on which an expert witness may be allowed to testify, and, unless there is a clear showing of error, its decision will not be disturbed on appeal... . This discretion, however, is not boundless and expert testimony should be excluded where the facts testified to are of such a nature as not to require any special knowledge or experience in order for the jury to form conclusions from the facts. Nelson v. State, 362 So.2d 1017 (Fla. 3d DCA 1978); Johnson v. State, 314 So.2d 248 (Fla. 1st DCA 1975). The common thread running through all the decisions dealing with the admissibility of expert testimony is the premise that if the disputed issue is beyond the ordinary understanding of the jury, such testimony is admissible.
Sections 90.401, 90.402 and 90.403, Florida Statutes (1987), provide:
90.401 Definition of relevant evidence  Relevant evidence is evidence *721 tending to prove or disprove a material fact.
90.402 Admissibility of relevant evidence.  All relevant evidence is admissible, except as provided by law.
90.403 Exclusion on grounds of prejudice or confusion.  Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence. This section shall not be construed to mean that evidence of the existence of available third-party benefits is inadmissible.
Section 90.702, Florida Statutes (1987), provides:
90.702 Testimony by experts.  If scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify about it in the form of an opinion; however, the opinion is admissible only if it can be applied to evidence at trial.
Defendant's counsel, to his professional credit, was candid with this court in advising us at oral argument that as early as 1978, testimony similar to that challenged here was admitted in two Arizona criminal cases.[1]
I believe Dr. Jacobs' testimony made the subject matter understandable to the jury; and that without it, they  as I  would have stumbled around in the dark. His testimony revealed that many hospitals require psychological autopsies when there has been a suicide; that as of 1986, there were approximately 30,000 suicides a year in this country, 2,000 of which are in the victim's age bracket; and that the question to be answered was why a particular person would choose death over life.
Dr. Jacobs had worked with a pioneering psychologist at UCLA who had interviewed a number of people who tried  but failed  to take their own lives, whether by jumping from heights or shooting. The inquiry was as to their thoughts and their feelings. In his testimony, he went through numerous factors: namely, purpose  suicide as a solution to a problem of intolerable psychological pain; frustrated needs; hopelessness; helplessness; fragile ambivalence in choosing between life and death; the individual's perceptual attitude on thinking; egression or escape; communication of intention; and consistency of lifelong coping patterns.
He then went through the risk factors in young people's suicides, including a diagnosable mental illness, or general risk factors of vulnerability such as hopelessness, or a history of prior attempts, drug or alcohol abuse, social violation and behavioral difficulties. He described a group, primarily women, who have a diagnosis of depression and, having contemplated suicide for a long time, commit it in the throes of depression. In the completed suicides, the critical element in all of this is the individual's self-worth. He noted the presence of psychological abuse and aloneness or of self-contempt, or murderous rage to drive one to suicide. He closed his general remarks by saying that those in his field  suicidologists  look at specific causes, as well as some type of abuse which lead a vulnerable person to the conditions he described.
Dr. Jacobs then went through the steps that made up the foundation for his expert opinion as to Tina Mancini, the teenage victim here. He brought out her previous suicide attempt at the age of thirteen and her sense of ambivalence at that time by calling her friends for help, her growing up in an atmosphere of several marriages and several moves, her attempts to get away from her mother, the defendant, even contacting the police for help. Her dropping out of school may have been the first sign that she was giving up or giving in to her situation. Dr. Jacobs described Tina's emotional isolation in the last six months, the friend's rejection of her last plea for help on the day of her suicide when she said *722 about the work she felt to be degrading: "I want to get out of what I'm doing." He stated:
And then I made a psychological interpretation of what was being communicated to this young girl when she was asked to do something which one might not ordinarily ask of this child, to work in a place like this just to bring home the money, that your self worth, your value to me, was in the amount of money you could bring home, regardless of how the, how you did that.
And I think this is what I call the, sort of the psychological straightjacket that Tina must have felt herself in, that she couldn't move one way or the other, because this comes up in other cases of abuse, when children, young people, adolescents want to get out of the situation but are so afraid of the consequences they begin to feel trapped.
... .
Q Doctor, when we talk of pain, what type of pain are we talking about?
A Well, again, as I tried to describe, we are talking about a combination of feelings. We know she had an argument with her mother. We know that she was bothered and angry and feeling alone. So the murderous rage that must have built up in her was a feeling that she was experiencing that is literally painful. It can make someone want to burst. And when someone doesn't see any relief in sight, what they will do, and this is what I always think is the tragedy in suicide, they pick a permanent solution to a temporary problem. And if we could only get inside the mind for a moment and say we can do something to relieve that pain, suicide may not occur.
Q Doctor, is there a significance as to the method used to commit suicide, particularly a gun?
A Well, fifty to sixty percent of all completed suicides are done by firearms, so that  and that is whether young or old  the fact that she chose a violent, lethal method indicates that she had reached the final straw, that she was not placing herself in a position of rescue.
Sometimes people make very serious attempts but actually try to calculate, they take certain numbers of pills knowing what is the lethal amount. Here there was no doubt in her mind of what she wanted to accomplish.
... .
Q (By Ms. Kearney) Knowing that is Tina, 86472, Tina Mancini's autopsy number, and having looked at those photographs, do those photographs help you in understanding Tina Mancini's suicide by use of a .357 Magnum in the mouth?
A Well, I think what's really of note here is the, well, obviously, the violent aspect of it and the extreme certainty in her mind that there was nothing else that she wanted other than death.
... .
Q (By Ms. Kearney) Doctor, at this time, what other risk factors did you find that made Tina Mancini particularly vulnerable to suicide?
A Well, I think that the issue of self-worth that I have talked about became the most predominant feature over the ensuing six months prior to her death, so it was  and the statements that she made about feeling that she couldn't make it, that she had no way out  beginning to demonstrate that she was taking on the characteristics of a suicidal person.
Q Is that the feeling of powerlessness and helplessness?
A Yes. One of the factors that we talked about is the sense of hopelessness and helplessness and powerlessness. The issue of powerlessness is particularly relevant in situations in which a person is in an abusive relationship in which they are totally without an ability to respond. They feel powerless, and it is one of the worst experiences that a person can go through.
And in fact, in treatment, what one tries to do is you try to objectively do the reverse, you try to empower them, you try to give them a sense that maybe there is a way to get back that sense of self-worth that has been diminished.

*723 Q What factors in Tina's history contributed to her lack of self-worth?
A The development of self-worth is a very complicated process and really requires a sustaining relationship with a parent over a period of time, whether it be the mother or the father, or it could be some parent substitute, to give them a sense that they matter, that they matter for themselves, so that as they grow up they can then take that feeling into themselves.
Another aspect of a person's development that they use for self-worth is what can they master, what can they do. Well, in Tina's case, she did well in school up to a period of time, but then she dropped out, so school work was not an area that she could use for self-worth, self-esteem.
Dancing is something that made her feel good about herself, yet even in that area it became a conflict for her.
So in some sense, she was deprived of something that under ordinary circumstances she might have been able to develop and allow herself to feel good about herself. So that was another element.
Q What was the conflict?
A Well, the fact that she was forced to be in a situation that she didn't want to be in, even though there were aspects of it that she enjoyed. So she may be liking the physical aspects of the dancing, but what she had to do while dancing, in her own mind, was not what she wanted.
Q Were there any other factors that left her particularly vulnerable to suicide that existed within the home or in her relationship with her mother?
A Well, you know, I know from records that they had what has been described as an uneasy relationship. We know that there was tension, that she tried to run away. To not feel safe in one's home, if you can't feel safe in your home, then where else can you feel safe? And safety is more than physical safety, it is really emotional safety, feeling good about one's self. Things have to be quite bad to want to get away from home. Knowing that she, you know, she was really deprived of going to the grandfather because of the legal issues, the court rulings that were established, so there weren't too many places, there wasn't really any place that she could go, so that the issue of emotional safety was another risk factor.
Q Doctor, is there anything else that you have based your opinion on, your ultimate opinion on, any other factors, in reviewing Tina Mancini's life or history or any other records that were provided to you that you found significant in formulating your opinion?
A Well, I think the other, and let me just say something about the gun and the choice of the gun.
Q Uh-hum.
Q [sic] We talked about the violent aspect of it. We didn't talk about the fact that it was the mother's gun. It was a gun that had been, that Tina knew was there. She knew that her mother would find her. She wanted to communicate something to the mother and in essence was saying, "You won't let me get out of the situation, so look what I have to do and look what I am doing with it, your gun." So that was a, that is another factor that I based my opinion on.
... .
Q (By Ms. Kearney) Doctor, I put the question to you again. In the bounds of reasonable psychiatric certainty, have you reached an opinion as to the cause of Tina Mancini's suicide?
A Yes.
Q What is that opinion, sir?
A That I have determined that the nature of the relationship, the abusive relationship with the mother, was a substantial contributing cause to Tina Mancini's suicide.
Q How so, sir?
A The degree of hopelessness and helplessness and powerlessness that was created in the home situation ultimately led this young girl to try various ways to relieve herself of that situation, which she was unable to do. Her options became *724 depleted. She felt that there was no way out. She tried several ways, and, ultimately, she felt that there was only one way to relieve the pain, and that was through death.

II
While I quoted much of Dr. Jacobs' testimony above to show the basis for my conclusion that the trial court did not abuse its discretion in admitting it, there were other reasons for doing so.
First, the subject matter warranted informing the bench and bar. Second, the tragedy in this case reminded me of a wise jurist's remarks to a bar association that we have to be shocked before we respond to a societal need. All of Dr. Jacobs' testimony should shock us enough to be so concerned about our individual self-worth that we do something about it  for ourselves and our families. Finally, I wanted future readers of this opinion to remember the victim, the defendant, the needlessness of what occurred here and, in my view, our obligation to ourselves to learn from it.
The defendant and victim in this case were individual parts of a dysfunctional family. In the first of her two books, Codependent No More (1987), Melody Beattie begins her chapter entitled "codependency" with a quote from Colette Dowling: "Relationships are like a dance, with visible energy racing back and forth between the partners. Some relationships are the slow, dark dance of death." Id. at 27.
Dysfunction is visible  death, dependency, delinquency, crime, or dissolution of marriage. Judges are employed to deal with dysfunction.
Yet, there is an invisible crisis which I believe exists today  one that we judges do not see even when we are addressing all matters before us because, sadly, we have not been trained to see it. In short, we judges have not been trained to understand ourselves, much less anyone else.
Authored over forty years ago, Joshua Loth Liebman's little book, Peace of Mind (1946), is as pertinent to our understanding now as then:
Psychology today can help us understand that one of the reasons we have failed to find peace of mind is that we have not yet learned how to be good to ourselves and, therefore, have not yet learned how to be good to others. Psychology reveals the underlying causes of false self-love and destructive self-hatred. Religion, allied with psychology, can demonstrate just what true self-regard means.
Id. at 40.
There are many temptations to self-contempt and self-destruction along the route that the ego takes to maturity. As a matter of fact, one reason why man can be more continuously cruel to himself than to anyone else is that he is always available to himself as an object of attack. Other people are intermittently present as objects of our aggression, but our own ego is always there, even in sleep, as a citadel to be stormed, a fortress to be smashed, an enemy to be destroyed. Suicide is only the extreme proof of the fact that man does not necessarily love himself. Many people go throughout life committing partial suicide  destroying their talents, energies, creative qualities. Indeed, to learn how to be good to oneself is often more difficult than to learn how to be good to others.
... .
There are myriad ways in which we show contempt and cruelty rather than respect and kindness to ourselves. Feelings of inferiority are among the commonest symptoms of self-hate. How often we attribute to our neighbors abilities and powers which they do not possess! We feel inferior to them, and an infinite amount of tragedy comes from this form of self-depreciation and inner self-contempt.
Id. at 46-47 (emphasis added).
Modern psychology, through its startling new insights into the subtleties and complexities of the human mind, should help religion to modify its views. Untenable *725 interpretations of human nature should be eliminated: morbid traits and attitudes which have been the major obstacles along the road to the good life should be removed. Religion must be brave enough to admit its errors and, after admitting them, use its enormous influence for the creation of a happier and psychically freer mankind. Likewise, religion must be humble enough to accept the tools of the psychological laboratory to force open the door of this final great mystery  why man, with all the power he possesses, is still so far from happiness and peace.
The mystery can be partially solved today by the use of these new insights of dynamic psychology. If man is tormented by an overdemanding conscience; if he has never learned the art of proper self-love, but is enslaved to a compulsive, greedy, never-to-be-satisfied selfishness; if he is driven by inner shadow fears, has never honestly come face to face with grief, nor learned how to transcend it; if he flees from maturity and will not accept adult responsibility  how can such a man ever help to create a good life for himself or a god-like society for others?
Id. at 201-02.
The copy which I discovered on my shelf reflects it to be part of the 20th printing, when purchased; yet it has long since been put aside. Over thirty years later, Dr. M. Scott Peck's, The Road Less Traveled (1979), picked up the same themes:
Transference: The Outdated Map
This process of active clinging to an outmoded view of reality is the basis for much mental illness. Psychiatrists refer to it as transference. There are probably as many subtle variations of the definition of transference as there are psychiatrists. My own definition is: Transference is that set of ways of perceiving and responding to the world which is developed in childhood and which is usually entirely appropriate to the childhood environment (indeed, often life-saving) but which is inappropriately transferred into the adult environment.
... .
For the most part, mental illness is caused by an absence of or defect in the love that a particular child required from its particular parents for successful maturation and spiritual growth. It is obvious, then, that in order to be healed through psychotherapy the patient must receive from the psychotherapist at least a portion of the genuine love of which the patient was deprived. If the psychotherapist cannot genuinely love a patient, genuine healing will not occur. No matter how well credentialed and trained psychotherapists may be, if they cannot extend themselves through love to their patients, the results of their psychotherapeutic practice will be generally unsuccessful. Conversely, a totally uncredentialed and minimally trained lay therapist who exercises a great capacity to love will achieve psychotherapeutic results that equal those of the very best psychiatrists.
Id. at 46, 175.
Although only 12,000 hard cover copies of the Peck book were sold, ten years later it remains on the best-seller paper back list, where it has been for over 300 weeks. Why?
I suggest the Peck book will continue to be read because of our growing appreciation of the indispensable need to understand ourselves. What Dr. Peck called "transference"  now called "codependency"  may represent the emotional condition of most of us, no matter how high the cotton in which we walk!
There are a number of definitions of codependency, five of which have been collected in Dr. Charles L. Whitfield's Healing the Child Within (1987):
1) ... an exaggerated dependent pattern of learned behaviors, beliefs and feelings that make life painful. It is a dependence on people and things outside the self, along with neglect of the self to the point of having little self identity.
(Smalley, S: cited in Wegscheider-Cruse, 1985)
2) ... preoccupation and extreme dependence (emotionally, socially, and *726 sometimes physically) on a person or object. Eventually, this dependence on another person becomes a pathological condition that affects the co-dependent in all other relationships. This may include ... all persons who (1) are in a love or marriage relationship with an alcoholic; (2) have one or more alcoholic parents or grandparents; or (3) grew up in an emotionally repressive family . .. It is a primary disease and a disease within every member of an alcoholic family.
(Wegscheider-Cruse, 1985)
3) ... ill health, maladaptive or problematic behavior that is associated with living with, working with or otherwise being close to a person with alcoholism (other chemical dependence or other chronic impairment). It affects not only individuals, but families, communities, businesses, and other institutions, and even whole societies.
(Whitfield, 1984, 1986)
4) ... an emotional, psychological, and behavioral pattern of coping that develops as a result of an individual's prolonged exposure to, and practice of, a set of oppressive rules  rules which prevent the open expression of feeling, as well as the direct discussion of personal and interpersonal problems.
(Subby, 1984)
5) ... a disease that has many forms and expression and that grows out of a disease process that ... I call the addictive process ... the addictive process is an unhealthy and abnormal disease process whose assumptions, beliefs, behaviors, and lack of spiritual awareness lead to a process of nonliving which is progressive ...
(Schaef, 1986)
Id. at 29.
Some of us are familiar with John Bradshaw's Bradshaw On: The Family (1988) and Bradshaw On: Healing the Shame that Binds You (1988), which are representative of current thinking. Because most of us do not get to the roots of individual problems from just reading a book, therapists today are employing group therapy as a very effective way of reaching that child within us and restoring our self-worth, because group therapy has been so effective in treating substance abuse. Working through the pain in a safe, nourishing atmosphere works.
Bradshaw On: Healing the Shame that Binds You, says:
Toxic shame is primarily fostered in significant relationships. If you do not value someone, it's hard to imagine being shamed by what he says or does. The possibility of toxic shame begins with our source relationships. If our primary caregivers are shame-based, they will act shameless and pass their toxic shame onto us. There is no way to teach self-value if one does not value oneself.
Toxic shame is multigenerational. It is passed from one generation to the next. Shame-based people find other shame-based people and get married. As a couple each carries the shame from his or her own family system. Their marriage will be grounded in their shame-core. The major outcome of this will be a lack of intimacy. It's difficult to let someone get close to you if you feel defective and flawed as a human being. Shame-based couples maintain non-intimacy through poor communication, non-productive circular fighting, games, manipulation, vying for control, withdrawal, blaming and confluence. Confluence is the agreement never to disagree. Confluence creates pseudo-intimacy.
When a child is born to these shame-based parents, the deck is stacked from the beginning. The job of parents is to model.
Id. at 25.
In Learning to Love Yourself: Finding Your Self-Worth (1987), Sharon Wegscheider-Cruse observes:
VALIDATING THE SELF IN CHILDHOOD
A major contributor to whether or not worth is high or low tends to stem from whether children were given messages that affirmed or validated their existence, *727 their choices, their talents, their ideas, their plans. If these parts of themselves were not validated, children seemed to feel less important or valued than those around them.
Imagine for yourself a large basket given to you at birth. During your early years, you collect learning that gives you energy, hope, skills, desire, and good feelings about yourself. We'll call those messages "flowers." You also collect messages that make you feel inadequate, small, guilty and afraid. We call these messages "garbage messages."
Look at the following messages and assess what you are carrying around in your basket.
Garbage Messages
(Messages that make us feel bad and unloved)
. Don't say anything if you can't say something nice (Hide true feelings)
. Family business is private business (Don't trust)
. Work first, play later (What you do is more important than who you are)
. Boys don't cry (Men should always be strong)
. Women shouldn't get angry (Women should cover up angry feelings)
. Don't speak unless spoken to (Spontaneity is wrong)
. Don't talk about sex (There is something wrong with bodies)
. You made your bed, now lie in it (There is no room for mistakes)
. Anything worth doing is worth doing well (Strive for perfectionism in everything)
. Money doesn't grow on trees (Watch whatever you spend)
. You can do better (What you are doing is not good enough)
. I told you so ... (You should have listened and did what I said. I am right and you are wrong)
. Don't hang your dirty linen in public (Don't talk and don't ask for help)
. Blood is thicker than water (Family loyalty comes first whether or not it is deserved)
Think about some of your own rules and messages you brought from the family you lived in. How many of them made you feel an increased value about yourself? And how many of them made you feel bad about yourself? Let's look at some positive messages (flowers) that make people feel better about themselves:
1. I'm really proud of you today.
2. That was a really good idea you had.
3. Keep up the good work.
4. You are a very special person.
5. Good for you!
6. You seem to have a lot of good ideas.
7. You'll probably learn a lot from that mistake.
8. It's a pleasure to work/play with you.
9. I like you just the way you are.
10. It's okay to have a lot of feelings.
11. Sometimes tears are refreshing.
12. I'm sorry. You are right.
13. I'm happy when I'm with you.
Id. at 12-14.
I suggest that we are a society pervaded with not just the visible dysfunctional family, but also invisible non-harmonious families which do not produce the tragedy of suicide, but do produce tragedies of emotionally unhealthy children who pass along their toxic shame to their own children.
One psychologist has recently observed that our challenge is to change a society of human doers to human beings. We start with ourselves. Accordingly, to the bumper sticker question "Have you hugged your child today?" we now answer "Yes, my inner child." We judges, I suggest, could set an example by learning to understand ourselves. Arthur Schopenhauer put such individual challenge best: "All truth passes through three stages. First, it is ridiculed. Second, it is violently opposed. Third, it is accepted as being self-evident."
NOTES
[1] State v. Wendy Jones, 1 CA-CR 2589 (Ariz. Ct. App., April 18, 1988) (Mem.); State v. Carruthers, Crim. No. 100359 (Ariz.Super.Ct., June 7, 1978).