**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Gloria BURTZLAFF, Defendant and Appellant.**

No. 17718.

Supreme Court of South Dakota.

Argued Sept. 2, 1992.

Decided Nov. 25, 1992.

Mark Barnett, Atty. Gen., Sherri Sundem Wald, Asst. Atty. Gen., Pierre, for plaintiff and appellee.

Michael W. Strain of Morman, Smit, Hughes, Strain, Molstad & Haivala, Sturgis, for defendant and appellant.

HENDERSON, Justice.

### PROCEDURAL HISTORY/ISSUES

On April 11, 1991, the Defendant, Gloria Burtzlaff, was indicted for: Count I—First Degree Murder—Premeditated Design; and, in the alternative, Count II—First Degree Manslaughter. On June 19, 1991 and June 29, 1991, the trial court heard preliminary motions concerning (1) suppression of evidence, (2) intent to offer "other acts" testimony, (3) motions in limine to preclude a psychiatric autopsy of the victim, (4) psychiatric evidence regarding Burtzlaff's mental state at the time of the shooting, and (5) prohibition of comments during voir dire concerning the death penalty.

Jury trial was held from August 20 through August 30, 1991. The jury returned a verdict of not guilty on Count I, but guilty on Count II—First Degree Manslaughter.

Sentencing was held on October 22, 1991. The trial court sentenced Burtzlaff to twenty (20) years at the Springfield Correctional Facility. Bond pending appeal was denied.

Burtzlaff is currently incarcerated at Springfield.

Notice of Entry of Conviction and Sentence was filed on October 22, 1991. Notice of Appeal was filed on October 24, 1991.

On appeal, Burtzlaff raises the following issues:

I. DID THE EVIDENCE SUFFICIENTLY SUPPORT A VERDICT OF MANSLAUGHTER?

II. DID THE COURT ERR IN EXCLUDING THE PSYCHOLOGICAL AUTOPSY OF THE DECEDENT?

III. DID THE COURT ERR BY ALLOWING THE STATE TO USE BURTZLAFF'S AFFAIR AS PRIOR BAD ACTS EVIDENCE?

IV. DID THE COURT ERR BY NOT PERMITTING EXPERTS TO TESTIFY THAT BURTZLAFF WAS A BATTERED WOMAN?

V. DID THE TESTIMONY, DURING REBUTTAL EXAMINATION, CONSTITUTE PREJUDICIAL HEARSAY?

VI. DID THE TRIAL COURT ERR:

a. IN INSTRUCTING THE JURY THAT THE DEFENDANT HAD TO BE IN IMMEDIATE DANGER IN ORDER TO ALLEGE SELF–DEFENSE, AND THEN FAILING TO GIVE THE DEFENDANT'S PROPOSED INSTRUCTION ON THE ISSUE; AND

b. IN ALLOWING AN ASSAULT "USE OF FORCE" INSTRUCTION IN A JUSTIFIABLE HOMICIDE CASE INVOLVING THE BATTERED WOMAN SYNDROME?

VII. DID THE COURT PROPERLY DENY BURTZLAFF'S MOTION FOR MISTRIAL?

VIII. DID THE STATE FAIL TO PROVE BEYOND A REASONABLE DOUBT THAT BURTZLAFF DID NOT ACT IN SELF–DEFENSE?

IX. a. DID THE PROSECUTION ERR BY ARGUING TO THE JURY THAT BURTZLAFF HAD A DUTY TO RETREAT; AND

b. DID THE TRIAL COURT CONSIDER DUTY TO RETREAT WHEN IMPOSING THE SENTENCE?

X. DID THE TRIAL COURT CONSIDER THE BATTERED WOMAN SYNDROME AS A MITIGATING CIRCUMSTANCE WHEN SENTENCING AND DID THE SENTENCE IMPOSED CONSTITUTE CRUEL AND UNUSUAL PUNISHMENT?

XI. DID BURTZLAFF RECEIVE A FAIR TRIAL?

We address each issue seriatim.

## FACTS

On April 5, 1991, at approximately 10:30 p.m., Gloria Burtzlaff phoned Lawrence County Sheriff Charles Crotty and stated that she had just shot her husband, Larry. Deputies Charles and Russell reported to the scene, the Burtzlaff's house, and found Mr. Burtzlaff in the living room, lying on his knees, face down by the couch, with a gaping hole in his chest. He was dead. Mrs. Burtzlaff stood outside wearing wet clothing.

Upon waiver of her Miranda rights, Burtzlaff reported the following: Larry had been drunk and physically abusive lately, especially that night. (The autopsy showed his blood alcohol content to be .358%.) After they had returned from a local bar, according to her story, he dragged her into the family hot tub fully clothed and shoved her under the water several times. When doing so, per her version of the facts, he would say "Tell me that you love me" and would ask "Do you still love me?" She said he then pulled her out of the tub, threw her on the floor, kicked her, and stated, "You think I'm going to kill you like this, don't you? I'm going to tell you right now it's not going to be this easy."

According to Burtzlaff, he left the room, whereupon she went downstairs and returned with a shotgun. She found him sitting on the couch with a drink in one hand and the television remote control in the other. She announced, "Larry, I'm going to kill you." He lifted his glass as if to toast her, she said; then she fired (from a

distance of six feet, according to expert testimony). The husband was unarmed. She telephoned Sheriff Crotty, then went outside where the Sheriff's Department found her. From the date that the victim learned of his wife's four year affair with a co-worker until Burtzlaff killed him, only three months and two days had passed.

She was later charged with first degree murder, and in the alternative, first degree manslaughter. She claimed self-defense as a battered woman.

Her trial testimony alleged a history of mental, physical, and sexual abuse by her husband, especially during the preceding week. She asserted that this was compounded by the fact that Larry had recently been diagnosed as having colon cancer and was forced to wear a permanent ileostomy bag. According to her testimony, abuse supposedly escalated in January when Larry learned that his wife had been involved in a four-year affair with co-worker Roger Schoon. The Burtzlaffs then briefly sought marriage counseling.

Despite his drinking and history of being a strict disciplinarian as a parent, no testimony other than Gloria Burtzlaff's could corroborate any history of violence. This includes the testimony of three sons of the marriage; one did testify that he saw a bruise of unknown origin, on his mother. However, experts testified as to the realities of battered woman syndrome and the symptoms the defendant possessed consistent with the syndrome. At trial, Burtzlaff testified Larry repeatedly threatened her life that evening. Burtzlaff admitted, however, she told Deputy Charles shortly after she shot her husband that she did not recall whether her husband had threatened her life that night. While she testified she shot her husband to save her own life, she also testified she did not know how or when Larry would kill her. When Deputy Sheriff Charles arrived at the scene, Burtzlaff repeatedly stated "I killed my husband. I can't believe it, I killed my husband." On the day following the homicide, Burtzlaff was examined by a doctor and a small bruise was found on her chest and upper arm and a larger bruise on her hip. The jury found Burtzlaff guilty of first degree manslaughter; and the judge sentenced her to confinement for twenty years, notwithstanding she faced life imprisonment.

## DECISION

1. *There was sufficient evidence to support first degree manslaughter.*

The third element of manslaughter requires the perpetrator to be without design to effect death. SDCL 22–16–15(3). Because Burtzlaff admitted telling the victim, "Larry, I'm going to kill you," she ironically alleges that there was design to effect death, thus eliminating the third element and a manslaughter conviction. However, an admission to shooting is not an automatic confession to killing with a premeditated design. *State v. Dokken*, 385 N.W.2d 493 (S.D.1986). "While it proves the fact that the defendant pulled the trigger, it does not concede guilt in murder or first degree manslaughter." *Id.* at 505.

Furthermore, the record discloses that Burtzlaff also testified that she did not shoot her husband intentionally. This, combined with her testimony that she did not remember actually carrying the shotgun, presented the finder of fact with sufficient evidence that Burtzlaff had no design to effect death, and thus will sustain a conviction of first degree manslaughter beyond a reasonable doubt. This Court will accept that evidence, and the most favorable inferences that can be fairly drawn therefrom, which will support the verdict. *State v. Lewandowski*, 463 N.W.2d 341, 343 (S.D.1990).

Under this standard of review, this Court will not resolve conflicts in the evidence, pass on the credibility of the witnesses, or weigh the evidence. These functions lie solely within the province of the jury as ultimate trier of fact. *State v. Wall*, 481 N.W.2d 259, 262 (S.D.1992); *State v. Huettl*, 379 N.W.2d 298, 302 (S.D. 1985). It has long been established by this Court that a jury verdict shall only be set aside where the evidence and the reasonable inferences to be drawn from the evidence do not sustain a rational theory of

guilt. *Lewandowski* at 344; *Huettl* at 301; *State v. Wedemann*, 339 N.W.2d 112 (S.D. 1983).

## 2. The trial court properly limited the scope of expert testimony.

(Issues II and IV have been combined because both concern expert testimony.)

■ Burtzlaff sought the trial court's permission to present expert testimony of a "psychological" autopsy of the decedent to the jury. Although he had never interviewed nor met the decedent, Dr. Richard Fairbairn was prepared to "reconstruct" the decedent's personality and behavior on the night of his death and testify that the defendant acted in self-defense.

Psychological autopsies have been admitted where the victim's state of mind was relevant, such as suicide victims (*Jackson v. State*, 553 So.2d 719 (Fla.1989); *Thompson v. Mayes*, 707 S.W.2d 951 (Tex.Ct. App.—Eastland 1986)) and where the murder defense was suicide (*Bartram v. State*, 33 Md.App. 115, 364 A.2d 1119 (1976)). Though these mental evaluations have been used for other purposes, Fairbairn admitted that the reconstruction of a decedent's personality was not common in the field of psychiatry.

Under SDCL 19–15–2, an expert may be allowed to testify on specialized knowledge which will assist the jury in determining a fact in issue. Although the court permitted Dr. Fairbairn to testify about Burtzlaff's state of mind on the night of the shooting and the victim's purported violent tendencies, he was not allowed to testify as to the victim's behavior and psychological status on the specific night of his death. Thus, the court did not abuse its discretion by refusing expert opinion concerning the decedent's mental state.

■ The expert must not invade the province of the jury. *State v. Werner*, 482 N.W.2d 286 (S.D.1992); *State v. Hill*, 463 N.W.2d 674 (S.D.1990). Fairbairn's testimony that Burtzlaff's actions were necessary and reasonable would only substantiate Burtzlaff's version of the victim's actions on the night of the killing. This blatantly goes to the ultimate issue of the defendant's self-defense claim.

■ Our trial courts have broad discretion regarding the admissibility of expert testimony. Absent an abuse of that discretion, the trial court's decision will not be reversed. *Werner* at 291; *Hill* at 676; *State v. Logue*, 372 N.W.2d 151, 156 (S.D. 1985).

■ Dr. Fairbairn and another expert were also permitted to testify in court about the realities of battered spouse syndrome. Both witnesses discussed the truths and misconceptions, as well as the symptoms Gloria Burtzlaff possessed, consistent with the syndrome. Though experts did testify on hypotheticals that correlated with Burtzlaff's testimony concerning her husband's actions, the court did not permit either expert to testify that Burtzlaff was, in fact, suffering from battered woman syndrome.

Under a self-defense argument, the issue is whether Burtzlaff perceived herself to be in imminent danger. SDCL 22–16–35. Burtzlaff maintains the trial court erred because battered women perceive imminent danger differently than the average person. Thus, Burtzlaff desires to tell the jury, "It might not be imminent danger to you but it would be to a battered woman and Gloria Burtzlaff is such a woman." For an expert to testify that Burtzlaff was a battered woman goes to the heart of the ultimate issue. As stated above, an expert must not invade the province of the jury.

Thus, we find that the trial court did not abuse its discretion in limiting the scope of expert testimony.

## 3. The State did not introduce any evidence of prior bad acts. However, when Burtzlaff opened up evidence concerning her extra-marital affair, the State had the right to cross-examine.

■ The State submitted a motion to use Burtzlaff's extra-marital affair as evidence of prior bad acts as motive for murder. Although the court granted the motion, the State never mentioned the affair during its case-in-chief. Instead, it was the defense that first enlightened the

jurors to the improprieties. Several defense witnesses, including Burtzlaff herself, testified to the affair and thus "opened the door." The admission of evidence is not prejudicial when such evidence is conceded by the defendant. *State v. Brown*, 480 N.W.2d 761 (S.D.1992); *State v. Leonard*, 243 N.W.2d 887 (Iowa 1976). Thus, the defendant will not be granted a reversal based upon her own failed trial strategy.

4. *The trial court did not permit any prejudicial hearsay.*

(Issues V & VII have been combined because both concern the admissibility of alleged hearsay testimony.)

Burtzlaff testified that her husband was insecure about the marriage. Expert witnesses testified that batterers are typically jealous and prone to keeping the spouse under surveillance. During rebuttal testimony, the State called Sharon Mercer to dispute inferences that Larry Burtzlaff had these characteristics.

Under direct examination, the court permitted the following testimony:

Q. Did Larry appear to you to be a suspicious person or a jealous person when it came to Gloria while she worked there?

A. No.

Q. What made you think that?

A. There was one case when Larry and myself and several other employees had to go down to Des Moines, Iowa to our corporate headquarters. During this time Larry called back from Des Moines to the Whitewood office and had asked to speak to Roger on the phone. The person that answered the phone called over to the accounting office and the person there that worked with Gloria said that ...

Mr. Hughes: Your Honor this is hearsay about three times removed.

The Court: It seems to be.

Mr. Bloomberg: Your Honor, I'm not going to offer it to prove the truth of the matter asserted. It's going to show what the affect [sic] of this conversation had on Larry.

The Court: Overruled.

Q. Go ahead.

A. Okay. It was told that the person that answered the phone that Gloria and Roger had gone out to Gloria's house to sit in the hot tub during their lunch hour. When she told Larry on the phone, Larry just said "I didn't ask you where he was or what he was doing. Now let me talk to someone else" and he asked for another employee.

Q. Did he seem concerned at all about that message?

A. No, he didn't.

Upon initial inspection, as the trial judge indicates, the testimony appears to be hearsay. Hearsay is a statement, other than one made by the declarant while testifying at trial, offered to prove the truth of the matter asserted. SDCL 19–16–1. However, the statement does answer the question why Mercer did not view Larry Burtzlaff as a jealous man.

Burtzlaff asserts that this "hot-tubbing" remark is "clearly unduly prejudicial" and serves only to highlight the affair. Evidence discloses that she testified that her liaisons with one Schoon occurred in the middle of the day. Prejudicial error is error which in all probability must have produced some effect upon the jury's verdict and is harmful to the substantial rights of the party assigning it. *State v. Phillips*, 489 N.W.2d 613, 617 (S.D.1992); *State v. Michalek*, 407 N.W.2d 815, 818 (S.D. 1987).

However, the fact that Burtzlaff had committed indiscretions was already common knowledge in these proceedings. The details of the phone call were cumulative evidence. If this Court were to deem the statement as inadmissible, it would only find harmless error. "Where inadmissible evidence admitted at trial is cumulative only and other admissible evidence supports the result, the cumulative evidence, though inadmissable, is non-prejudicial." *State v. Brown*, 480 N.W.2d 761, 764 (S.D.1992); *State v. Tribitt*, 327 N.W.2d 132, 135 (S.D.1982).

■ This Court has broad discretion in granting a mistrial. The decision of the lower court will not be disturbed absent a clear abuse of discretion and an actual showing of prejudice. *State v. Bogenreif,* 465 N.W.2d 777, 783 (S.D.1991); *State v. McDowell,* 391 N.W.2d 661, 666 (S.D.1986). During the "hot tubbing" testimony, there was apparently some reaction by spectators at the trial. This evinced the following admonition by the trial court:

I guess I have one comment to make as far as the audience is concerned. This is a jury trial. The jury is to consider the case based upon what's received here, not based upon any comment from anyone in the audience. So, I remind you spectators that if you have reaction to any testimony, keep your reaction to yourself ...

These comments by the trial court were made outside the presence of the jury.

Because we find no prejudicial error in the testimony or abuse of discretion by the trial judge, we will not disturb the lower court's ruling which denied the mistrial.

5. *There were no jury instruction errors.*

At trial, Burtzlaff specifically objected to Instructions # 7, # 10, and # 17, and proposed two instructions. During argument to the trial court, defense counsel made a reference to Instruction # 21, but no objection was made to it or any other instruction other than # 7, # 10, and # 17. The court denied the objections and the proposed instructions. The defense took special exception to the ruling on the objection.

■ Now, Burtzlaff contends that jury instructions # 17 through # 21 were in error because they were not tailored to a battered woman self-defense. Of this group of instructions, only # 17 was challenged at trial. Failure to object to an instruction at trial will not preserve an error for appeal. *State v. Holloway,* 482 N.W.2d 306, 309 (S.D.1992); *State v. O'Connor,* 378 N.W.2d 248, 256 (S.D.1985); *State v. West,* 344 N.W.2d 502 (S.D.1984). Therefore, Instructions # 18 through # 21 are not subject to appellate review. Only instruction # 17 will be considered.

■ Jury instructions are to be considered as a whole. *O'Connor* at 256. If they correctly state the law and inform the jury, the instructions are sufficient. *O'Connor* at 256. Burtzlaff claims that the instruction was in error because it did not consider the effect of battered woman syndrome under the circumstances. We strongly disagree. Instruction # 18 (not objected to) told the jury to view the evidence through the eyes of a reasonable prudent battered woman. Instruction # 17 properly informed the jury that the burden of proving that Burtzlaff did not act in self-defense rests upon the State to prove beyond a reasonable doubt. *Satter v. Solem,* 422 N.W.2d 425, 429 (S.D.1988), *cert. denied,* 490 U.S. 1091, 109 S.Ct. 2432, 104 L.Ed.2d 989 (1989).

Furthermore, as Burtzlaff concedes in her brief, the instruction concerning use of force correctly states the law. SDCL 22–16–35, 22–18–4. Though she finds the inclusion of this standard unnecessary, she specifically objected to # 17 for applying this standard. Because the instructions as a whole correctly state the law, we find no error with these instructions.

6. *The jury was instructed that there was no duty to retreat, and the State proved beyond a reasonable doubt that Burtzlaff did not act in self-defense.*

(Issues VIII and IXa have been combined because both concern the elements of self-defense.)

■ When a defendant raises the affirmative defense of self-defense, it is incumbent upon the State to prove beyond a reasonable doubt that the killing was without authority of law. *Francis v. Franklin,* 471 U.S. 307, 314, 105 S.Ct. 1965, 1971, 85 L.Ed.2d 344, 353 (1985); *State v. Wilcox,* 48 S.D. 289, 297, 204 N.W. 369, 372 (1925). This burden was properly stated in Instruction # 17. The jury was also instructed as to self-defense. Instruction # 21 provided in part:

A person who has been attacked and who is exercising her right of lawful self-defense is not required to retreat, and she not only may stand her ground and

defend herself against the attack but also may pursue her assailant until she has secured herself from danger if that course appears to her, and would appear to a reasonable person in the same situation, to be reasonably and apparently necessary; and this is her right even though she might more easily have gained safety by withdrawing from the scene.

Burtzlaff contends that the State did not meet its burden of disproving self-defense. Burtzlaff also claims that the State argued or implied that she had a duty to retreat from her home rather than defend herself. The State made several references to the fact that after the attack, Burtzlaff left the hot tub room, went through other rooms, went downstairs, returned upstairs and passed through other rooms while ignoring three exits from the house before shooting the victim. Despite the notion that the State was planting seeds of "duty to retreat" in the minds of the jurors, the court properly instructed the jury that she had the right to stand her ground. Instruction # 21 (not objected to) provided:

A person who has been attacked and who is exercising her right of lawful self-defense is not required to retreat, and she not only may stand her ground and defend herself against the attack but also may pursue her assailant until she has secured herself from danger if that course appears to her, and would appear to a reasonable person in the same situation, to be reasonably and apparently necessary; and this is her right even though she might more easily have gained safety by withdrawing from the scene.

Where an assault is made with only the hands and fists but with such force and in such manner as is likely to produce great bodily injury, the person attacked may lawfully resist the attack with whatever force is reasonably and apparently necessary.

If an assault with the fists or hands or by means not likely to produce great bodily injury is being made on a person, and if the one thus attacked is not deceived as to the character of such an assault, she is not justified in using a deadly weapon in self-defense.

A person who defends herself against unlawful attack must stop the use of force as soon as danger of attack has ended. If it would appear to a reasonable person in the same position that there is no further danger, then there should be no further force.

This was not a situation where in the midst of an attack, she reached for a weapon and defended herself. The alleged attack at the hot tub by husband upon wife had ended. The husband retreated to another part of the house to sit on the couch and watch television, and the wife went downstairs to get the shotgun. She was not pursued nor was she trapped inside the house. Instead, she returned upstairs and fatally shot her husband. It is obvious that the jury did not accept the self-defense claim of Burtzlaff.

We note that our sister state of North Dakota has held that the existence of a battered woman syndrome may exist in a marriage but this does not, of itself, establish the legal right of a wife to kill the husband. Rather, the evidence must still be considered in the context of self-defense. *State v. Leidholm,* 334 N.W.2d 811 (N.D.1983). A defendant's evidence must be sufficient to create or leave in the minds of the jury a reasonable doubt as to whether she was justified in taking the victim's life.

Provided that the jury believed that Gloria Burtzlaff had been physically and psychologically abused over an extended period of time by the dominance of her husband, i.e., a battered spouse, the question comes down to this: would a reasonable and prudent battered woman have believed serious bodily injury or death was imminent? The jury received instructions on this question in Instructions # 17, 18 and 19. We set forth the trial court's Jury Instruction # 17, # 18 and # 19 in toto.

## INSTRUCTION NO. 17

A homicide is justifiable when committed by any person when resisting any

attempt to murder such person ar (sic) when committed by any person in the lawful defense of such person, or of his or her husband, wife, parent, child, master, mistress, or servant when there is reasonable ground to apprehend a design to commit a felony, or to do some great personal injury; and imminent danger of such design being accomplished.

The defendant, however, must have acted upon an honest and reasonable conviction of necessity and a good faith belief that the decedent intended to kill or seriously injure him. The defendant having such an honest and reasonable apprehension of such danger may act to defend himself in such manner and with such means as may seem to him reasonably necessary in view of the circumstances. The kind and degree of force which a person may lawfully use in defense of himself is limited by what a reasonable person in the same situation as such person, seeing what he sees and knowing what he knows, then would believe to be necessary. Any use of force beyond that is regarded by the law as excessive. Although a person may believe that he is acting, and may act, in defense of himself, he is not justified in using a degree of force clearly in excess of that apparently and reasonably necessary under the existing facts and circumstances. When self-defense is raised as an issue by evidence showing the same, whether produced by the defendant or state, the burden of proving that the defendant did not act in self-defense rests upon the state to prove so beyond a reasonable doubt.

### INSTRUCTION NO. 18

Under certain circumstances, it is lawful to take the life of another. One who is acting in self-defense may take the life of an aggressor if the aggressor poses a serious risk of serious bodily injury or death. The risk of serious bodily injury or death must be imminent, that is it must be such that a reasonable and prudent person standing in the shoes of the Defendant, knowing what the Defendant knows and seeing what the Defendant

sees, would believe that serious bodily injury or death would result immediately if the aggressor were not killed.

In the case wherein the "Battered Woman Syndrome" is raised, and if you in fact find that Defendant is a battered woman, you are to look at the evidence presented through the eyes of a reasonable and prudent battered woman. If a reasonable and prudent battered woman would have believed serious bodily injury or death was imminent, then the killing was lawful. But, if you find that a reasonable and prudent battered woman would not have believed serious bodily injury or death imminent, then the killing was unlawful.

### INSTRUCTION NO. 19

The battered woman syndrome is a series of common characteristics that may appear in women who are abused physically and psychologically over an extended period of time by the dominant male figure in their lives.

Here, the jury heard all of the evidence; it decided upon the evidence and the instructions that Burtzlaff was not justified in taking the life of her husband.

The State supplied evidence supporting its burden: Burtzlaff retreated from the hot tub area, then returned to kill her husband. Burtzlaff, during trial, testified that the victim was going to kill her, but she did not know when or where.

■ Where the jury is properly instructed on the elements of self-defense and the State meets its burden of proof, we will defer to the jury's verdict and affirm the conviction. *Satter* at 429.

7. *Burtzlaff's sentence was clearly within statutory limits.*

(Issues IXb and X have been combined because both concern sentencing.)

■ When reviewing a sentence, we have held that the lower court must consider, inter alia, the unique circumstances of the case. *State v. Lohnes*, 432 N.W.2d 77 (S.D.1988). According to the sentence

hearing transcript, the trial judge did so and also considered the battered woman syndrome. This is a unique case in the history of South Dakota judicial history. At the sentencing, the trial judge stated:

... I have read every letter that has been written on your behalf. I read the entire presentence report. I have listened to the testimony of your sons twice now ... But after reading the evidence on battered woman syndrome, I was convinced that I needed to supplement the law in South Dakota in order for you to have what I felt would be a fair trial.

With a first degree manslaughter conviction, Burtzlaff was subject to a sentence of life in prison. Instead, she received a twenty-year sentence which is clearly within statutory limits. SDCL 22–6–1(3). This does not shock the conscience of men of reason generally and is not disproportionate so as to activate the proportionality tests of *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983); *State v. Bad Heart Bull,* 257 N.W.2d 715, 720 (S.D. 1977).

We find that the trial judge did consider the unique factors of this case and did not abuse his discretion in sentencing within the maximum statutory punishment. *State v. Bonrud,* 393 N.W.2d 785 (S.D.1986).

8. *Burtzlaff received a fair trial.*

■ This Court received a long list of errors that Burtzlaff claims prevented her from receiving a fair trial. As stated herein, we find no such errors or abuse of discretion. It has been stated many times by many courts: The accused is not entitled to a perfect trial, only a fair one. *McDowell v. Solem,* 447 N.W.2d 646 (S.D. 1989).

The judgment of the trial court stands affirmed.

SABERS and AMUNDSON, JJ., concur.

MILLER, C.J., concurs specially.

WUEST, J., concurs in part and dissents in part.

---

1. Justice Frank Henderson is the senior member of this court and is nationally recognized

MILLER, Chief Justice (concurring specially).

Under Issue 7, in upholding Burtzlaff's twenty-year sentence, the majority holds:

This (the 20–year sentence) does not shock the conscience of men of reason generally and is not disproportionate so as to activate the proportionality tests of Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983); State v. Bad Heart Bull, 257 N.W.2d 715, 720 (S.D. 1977).

I feel compelled to observe that, at least within binding federal decisional authority, no Eighth Amendment proportionality guarantee continues to exist outside of death penalty jurisprudence unless the penalty imposed is grossly disproportionate to the crime. *Harmelin v. Michigan,* 501 U.S. ——, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991).

Additionally, although I do not join his dissent, I agree with Justice Wuest that the time has now come for us to consider adoption of Federal Rule 704. Despite much reading on the topic, I have seen no persuasive, logical argument for retaining our current ultimate issue rule.

WUEST, Justice (concurring in part and dissenting in part).

Justice Henderson has written his usual excellent majority opinion.[1] I dissent therefrom on only one issue.

An ultimate issue is an issue of fact that the jury must decide, "such as whether a defendant possessed the culpable state of mind that is an element of the charged offense. The 'ultimate issue rule' prevents a witness from expressing an opinion on one of the ultimate issues to be decided by the trier of fact." McCormick on Evidence § 12, at 30–32 (3rd ed. 1984).

South Dakota retains the ultimate issue rule (as the "Ultimate Fact Doctrine") and does not permit an expert witness to express an opinion upon the ultimate issue,

for his excellent and often colorful writings.

holding it usurps the province of the jury. *State v. Werner,* 482 N.W.2d 286, 291 (S.D. 1992); *State v. Hill,* 463 N.W.2d 674, 677 (S.D.1990). Although South Dakota adopted the Federal Rules of Evidence as they existed in 1978, Rule 704, which permits such opinions, was specifically excluded. "South Dakota is the only state that declined to adopt any version of Rule 704[.]" 2 Gregory P. Joseph & Stephen A. Salzburg, Evidence In America: The Federal Rules In The States, ch. 53, 1 (1987).

When *Logue* was decided in an opinion authored by this writer, we followed *State v. Jenkins,* 260 N.W.2d 509 (S.D.1977), and took into consideration this State's rejection of rule 704 and adhered to the ultimate issue rule. *State v. Logue,* 372 N.W.2d 151 (S.D.1985). In *Logue,* we cited authority criticizing the ultimate issue rule but did not overrule it. We may have modified it in *Bachman* without expressly saying so; South Dakota permits psychiatric opinions in criminal cases where mental illness is pled as a defense. *State v. Bachman,* 446 N.W.2d 271, 275 (S.D.1989). Generally, however, we have continued to follow the rule.

In my opinion, we should abolish the ultimate issue rule and adopt Federal Rule 704 or something similar. I realize the committee who modified the Federal Rules for adoption by this Court felt otherwise, but fourteen years have passed, the law grows, changes and hopefully we all become wiser. Adoption of the rule should only take place after notice to the members of the State Bar for their comments and input.

In *Owen,* Chief Justice Miller advocated abandoning an "archaic," "obsolete" rule "out of the middle ages" and "adopting an approach which best suits modern times." *Owen v. Owen,* 444 N.W.2d 710, 714–17 (S.D.1989) (Miller, J., concurring specially to advocate abandonment of the *lex loci delicti* rule to determine conflict of laws questions).[2] In the words of Chief Justice Miller: "The underlying rationales for the rule, when put into practice, are simply not advanced, thus there is no reason to pre-

serve it." *Owen,* 444 N.W.2d at 715. So it is with our failure to abandon the "Ultimate Fact Doctrine" and adopt a version of Federal Rule 704.

The fact South Dakota is the only state refusing to adopt a version of the rule should teach us something. The rule does not work in practice: it is difficult to distinguish between ultimate and non-ultimate facts; it causes needless confusion in trying to separate matters of law and fact; a witness may have great difficulty expressing an opinion without using an ultimate fact; the rule is often simply ignored in practice; and finally, an expert cannot usurp the province of the jury because *the jury is always free to ignore the expert.*

All modern authorities criticize the rule prohibiting opinions on ultimate issues as being archaic. In discussing the logic of a witness "usurping the functions of the jury" Wigmore states: "the phrase is so misleading, as well as so unsound, that it should be entirely repudiated. It is a mere bit of empty rhetoric." 7 John Henry Wigmore, Wigmore On Evidence § 1920 (Chadbourn rev. 1978). McCormick discusses the problems inherent in applying the rule:

> This change in viewpoint concerning 'ultimate fact' opinion resulted from the fact that the rule excluding opinion of ultimate facts is unduly restrictive, with many possible close questions of application. The rule can often unfairly obstruct the presentation of a party's case, to say nothing of the illogic of the notion that opinions on ultimate facts usurp the function of the jury. In jurisdictions in which the prohibitive rule is retained, there [are] difficult and confusing questions whether an opinion concerns an ultimate fact.

1 McCormick On Evidence, § 12, 48–49 (4th ed. 1992). Discussing the advantages of Rule 704, Weinstein states:

> It eliminates quibbles over the meaning of ultimate fact, and the distinction between fact and law. Abolition of the rule ends the spectacle of courts endorsing a principle which they cite only as a

2. At that time, he was an Associate Justice of

this court.

precursor to applying an exception. It stops the resort to indirect means to bring the prohibited matter to the jury's attention, and most importantly, it allows the jury to receive the full benefit of a witness' judgment.

3 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence, ¶ 704[02] (1992). Professor John Larson, South Dakota's own outstanding authority on evidence, has criticized our rejection of Rule 704:

> The South Dakota Supreme Court adopted verbatim the first three sections ... 701 through 703 ... thereby further supporting the overall philosophy of liberalizing and broadening the common law evidentiary rules in favor of the admissibility of evidence. Unfortunately, it rejected the balance of the more modern federal article in favor of existing practice ... the rejection of FRE 704 has resulted in irreconcilable confusion in the decisions since that time.... South Dakota would do well to avoid further confusion on this issue by adopting FRE 704, thereby placing ultimate issue testimony in this state in the mainstream of modern thought on this subject. At present, the treatment of the subject is totally inconsistent.

John W. Larson, South Dakota Evidence, §§ 700.1, 704.1[3] (1991).

Judge James Adams, former Dean of the University of South Dakota School of Law, recommended adoption of FRE 704 in 1979, just one year after we failed to include it with the newly adopted evidence rules based on the federal code.[3] Christine Hutton, a Professor of Law at the University of South Dakota, pointed out this court's rulings on ultimate evidence often reach contradictory results and cannot be reconciled.[4]

I strongly urge adoption of Rule 704 and abandonment of 'our obsolete "Ultimate Fact Doctrine." It would simplify the hard work of trial judges, remove the embar-

rassing inconsistencies in our decisions and clarify the law for the Bar.

Having advocated changing the South Dakota rule on the ultimate issue, I now claim the proposed testimony of Doctor Fairbairn and Carol Maicki as to whether Defendant Burtzlaff was, in fact, suffering from battered spouse syndrome was not a question on the ultimate issue. The ultimate issue was whether Burtzlaff, without the justification of self-defense, was guilty of one of the criminal charges against her—not whether she was a battered spouse. Burtzlaff could have been suffering from the syndrome and still been guilty of manslaughter. A battered spouse does not possess a license to kill the batterer—I don't know anyone who claims he or she does. The diagnosis of battered spouse syndrome is a fact for the jury to consider along with other evidence in the case—it is not the ultimate issue.

While expert testimony explaining the syndrome has been allowed in South Dakota courts, the actual diagnosis that the defendant suffered from the syndrome has been left to the jury to decide. We have competent and intelligent jurors in this state but they are not trained to make clinical diagnoses of mental and physical symptoms. Such a diagnosis is "beyond the knowledge and experience of the average layperson." *Werner*, 482 N.W.2d at 291; *Hill*, 463 N.W.2d at 677. As long as an expert opinion does not go so far as to comment on the mental state of the defendant at the time of the act, it should be permitted. An expert's testimony that a defendant is suffering from battered spouse syndrome does not invade the province of the jury where the jury is not competent to make that decision.

Historically, women have been unprotected from violence by laws and custom. Even the Bible provides that a husband shall have dominion over his wife. Genesis 3:16. At English common law, a woman had few property rights. She had:

---

**3.** James R. Adams, *The South Dakota Evidence Code ... A Giant Step?*, 24 S.D.L.Rev. 1 (1979).

**4.** Mary Christine Hutton, *State v. Logue: Ultimate Issue Testimony in the Absence of A State Equivalent to Federal Rule 704*, 30 S.D.L.Rev. 530, 537 (1985).

[No right to] sue or be sued, and was considered a single legal entity with her husband, that is, his property. During this time, wife beating was an accepted practice. Consider the common law "Rule of Thumb" in England, in which the man was allowed to beat his wife with a rod "no thicker than his thumb." This rule was considered moderate at the time because it imposed restrictions on what a man could do in his own home. Joy Hannel, Note, *Missouri Takes a Step Forward: The Status of "Battered Spouse Syndrome" in Missouri*, 56 Mo.L.Rev. 465, 468 (1991). This court recognized the inferior position women had occupied in the law when it stated:

By primitive law, the only member of the family deemed to be harmed by an unjustifiable disturbance of family relations was the family head. [Citations omitted.] Under this primitive and Blackstone's common law the wife was regarded as a chattel, or a servant, who owed her service to her master, her husband, and she could not sue for any injuries sustained by her, as an individual[.]

*Hoekstra v. Helgeland*, 78 S.D. 82, 85, 98 N.W.2d 669, 670–71 (1959) (recognizing a wife's right to recovery for loss of consortium for injury to her husband). For too long, domestic violence was considered a family matter where law enforcement and the courts had no business.[5]

Fortunately, our society has changed its primitive attitude. In 1887, the legislature of Dakota Territory recognized women as separate legal persons:

"From and after the passage of this act, women shall retain the same legal existence and legal personality after marriage as before marriage, and shall receive the same protection of all her rights as a woman, which her husband does as a man; and for any injury sustained to her reputation, person, property, character or any natural right, she shall have the same right to appeal in her own name alone to the courts of law or equity for redress and protection that her husband has to appeal in his name alone[.]"

*Hoekstra*, 78 S.D. at 95, 98 N.W.2d at 675–76, (quoting Territorial Laws of Dakota, ch. 98, § 1 (1887); Compiled Laws of Dakota, Civil Code, § 2600 (1887)). The current laws of this state contain an entire chapter on protection from domestic abuse. SDCL ch. 25–10. Women are no longer considered the chattel or servants of their husbands but equal persons entitled to the protection and benefit of the law.

The law in South Dakota requires a person to reasonably perceive himself or herself to be in imminent danger before an act is considered self-defense. SDCL 22–16–35. The ultimate issue here was not whether Burtzlaff was a battered spouse but whether she was guilty of murder or manslaughter without the justification of self-defense. Dr. Fairbairn should have been able to give his diagnoses of Burtzlaff as a battered spouse. Carol Maicki should have been allowed to testify as to her belief that Burtzlaff was a battered spouse. The jury was free to ignore their testimony. Even if the jury believed the experts, it might have convicted Burtzlaff if it found she did not reasonably perceive herself to be in imminent danger at the moment she acted.

Expert testimony that the Defendant was diagnosed as suffering from the syndrome was necessary for the jury to fully consider the battered spouse defense. In my opinion, the trial judge erred in sustaining the state's objections to the expert's testimony as to whether or not Defendant was a battered spouse. Therefore, I would reverse on this issue.

---

**5.** L. Walker, Terrifying Love: Why Battered Women Kill and How Society Responds 236–37 (1989); A. Browne, When Battered Women Kill 4 (1987); Fargher, *Police Response to Violence Against Women in the Home*, in Private Violence and Public Policy: The Needs Of Battered Women And The Response Of The Public Services 110–124 (J. Pahl ed. 1985).